[No. S036864. Mar. 2, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE FRANCISCO GUERRA, Defendant and Appellant.

## COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, and Arnold Erickson, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, Keith H. Borjon and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHIN, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death under the 1978 death penalty law. A jury convicted defendant Jose Francisco Guerra of the first degree murder of Kathleen Powell. (§ 187, subd. (a).) The jury found true the special circumstance allegation that defendant murdered Powell while engaged in the attempted commission of rape (§ 190.2, former subd. (a)(17)(iii), now subd. (a)(17)(C))[2] and further found that defendant personally used a deadly and dangerous weapon, a knife, to commit the murder (§ 12022, former subd. (b), now subd. (b)(1)). After a penalty trial, the jury set the penalty at death. (§ 190.1 et seq.) The trial court denied defendant's motions for new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic.

We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The Prosecution's Case*

In October 1990, Kathleen Powell lived with her boyfriend, Charles Sims, on Kirkside Road in Los Angeles. The house next door to Powell's residence was being remodeled. Defendant was a construction worker at the remodeling site.

On October 25, 1990, around 7:15 p.m., Sims arrived home and found Powell's body lying on the utility room floor in a pool of blood with a knife on top of her chest. The utility room extended from the kitchen and had a door to the backyard.

Earlier in the morning, around 10:00 a.m., Powell beckoned to Odell Braziel, one of the workers at the construction site, to come to her house. Powell had hired Braziel about a week before the murder to repair some dents in her car and detail it. Thereafter, Powell occasionally had given him food and beverages as well as plates of sandwiches to share with the other construction workers. When Braziel reached Powell's house, she said, "I have

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] During pretrial proceedings, the trial court granted defendant's request to strike the special circumstance allegations that the murder was committed while lying in wait (§ 190.2, subd. (a)(15)) and during the commission of a burglary (§ 190.2, former subd. (a)(17)(vii), now subd. (a)(17)(G)).

a problem. I can't keep feeding all these people. You, I don't mind, you're working on my car," but "I got a problem with Francisco [defendant, Jose Francisco]. I can't keep him away from my house." Braziel suggested that she tell Sims or the contractor, or call the police. During their conversation, defendant walked into Powell's house through the utility room door and into the kitchen. The conversation ended, and as Braziel left, Powell asked him to take defendant back to the remodeling site. When he returned to the site, Braziel informed Al Canale, an electrical contractor, of Powell's complaint.

After lunch, defendant asked Braziel to buy him a quart of beer. Braziel returned shortly thereafter with the beer, found defendant standing on Powell's back patio, and gave him the beer. Around 2:30 p.m., Eric Sloane, the site manager, arrived at the remodeling site. Sloane testified that Braziel had complained that defendant was "pestering" Powell and spent considerable time at her house during the day. As Sloane walked around the site looking for defendant, he heard the gate to Powell's backyard close and observed defendant emerge from a hedge dividing the two houses. When Sloane asked defendant what he was doing on Powell's property, he noticed defendant's eyes were bloodshot and his breath carried a strong odor of alcohol. Sloane asked defendant whether he had been drinking, and defendant said that he had been robbed of his life savings the previous night. He apologized to Sloane and assured him that he would not go to Powell's property again. After his encounter with Sloane, defendant told Braziel, "Forget you see me there."

Shortly thereafter, Braziel found defendant on Powell's back patio. Braziel testified he tried to persuade defendant to leave, but defendant gyrated his hips "in a sexual way" and repeated, "Kathy for me, me for Kathy." Braziel demonstrated defendant's movement for the jury by simultaneously gyrating the lower portion of his body and thrusting his hips forward. Braziel observed defendant step through the patio sliding glass door and go about three feet into Powell's den just as the telephone rang. Powell answered the telephone in the front part of the house.

Octave Semere, a coworker of Powell's, testified that sometime between 3:00 p.m. and 3:30 p.m., he telephoned Powell. While speaking to Powell, he could hear Powell's sliding glass door open and close. Powell hollered for "Jose" to get out of the house and asked Semere whether he knew how to say "get out" in Spanish, but he did not. Semere heard a second person enter through Powell's sliding glass doors and heard a man's voice say to her in English that, "this guy Jose is crazy" and "not to trust him." He then heard Powell tell a third person who had come through the sliding glass door to get out of her house.

Meanwhile, in Powell's den, Braziel told defendant that Powell was just friendly and did not like him romantically. Defendant repeated "Kathy-me, me-Kathy" and continued to gyrate his hips. A few days earlier, while sitting around with several coworkers, defendant had made similar statements and gyrations and used the Spanish word "panocha," a slang term for female genitalia, in reference to Powell. Braziel believed defendant was drunk because he slurred his words, had a strong odor of alcohol on his breath, and had difficulty standing. Powell then called out, "Francisco, why don't you go to work? Why don't you find something to do?" and indicated, with a "shooing" motion, for Braziel to leave and take defendant with him. According to Braziel, she "begged" him to take defendant back to the jobsite. Braziel warned Powell that she should "watch out" for defendant and lock her door. He then returned to the jobsite with defendant.

Braziel testified that Powell had arranged to take him to her friend's house in the evening to work on the friend's car. Powell had told him she was going to take a nap and asked him to wake her up at 4:00 p.m. by tapping on her back window. When Braziel woke Powell from her nap, she said, "Francisco was in my house when I was asleep, and my door was open." Braziel asked her how she knew defendant was there, and she explained, "I know. I know. I could feel him. I know he was there. I locked my doors and I woke up, my doors were open."

Braziel returned to the jobsite and informed Canale about Powell's fear that defendant had been in her house. Canale testified that sometime after this conversation, he was working on an electrical panel about 12 to 15 feet away from Powell's utility room. Through the utility room window, he observed defendant standing in the utility room near the opened door leading to the backyard. Defendant was drinking a brown substance from a glass that Canale believed was Jack Daniels whiskey based on the odor of alcohol emanating from the utility room. Defendant walked in and out of Powell's utility room several times.

John Romanak, an electrical contractor, testified that he arrived at the remodeling site between 4:15 p.m. and 4:30 p.m. Canale informed him that defendant had been drinking and was bothering Powell. Defendant then staggered out of the kitchen and asked, "Que pasa?" Canale understood the phrase to mean, "What's happening?" and responded, "Nada," meaning "nothing." Defendant emitted a strong odor of alcohol. Romanak commented, "What's wrong with this guy? He seems awful uptight." Romanak suggested they put away their tools and leave for the day. Braziel put his tools away and met Powell in front of her house. After he got into her car, defendant approached Powell on the driver's side, reached for the upper back of the driver's seat with his right hand, and simultaneously leaned his upper body

and head into her car, possibly as if to kiss her. Defendant said something in Spanish to Powell, but Braziel did not understand him. Powell "jerked back" away from defendant and towards the passenger seat. She said she was afraid and would start locking her doors.

Susan Michel, Powell's neighbor, testified that sometime after 4:00 p.m., she observed defendant as she walked by the remodeling site. He asked her whether she had come from Powell's house. Michel answered, no, that she lived on the corner.

Powell and Braziel arrived at Ayshea Levy's house shortly before 5:00 p.m. so Braziel could detail Levy's car. Powell left 10 to 15 minutes later. After Braziel completed his work on Levy's car around 7:30 p.m., Levy's gardener, Roberto Gonzalez, gave him a ride to the intersection of Pico and La Brea.

Powell was scheduled to begin her work shift at 7:00 p.m. Around 7:15 p.m., Sims found Powell dead in their utility room and called 911.

Los Angeles Police Detective Kurt Wachter found Powell's purse in her car with the keys in the ignition. Powell's wallet was on the bar area of her house. The knife on Powell's chest matched the knife set in Powell's kitchen. The door leading from the utility room into Powell's backyard was locked with a key-to-key deadbolt. The side door to the house being remodeled was ajar.

Several of defendant's fingerprints and his bloody palm print were found on the walls of Powell's utility room, and his bloody palm print was found on the kitchen counter of the house being remodeled. Blood samples collected from the wall bearing the palm print in Powell's utility room and the fence separating Powell's front and backyards were consistent with Powell's blood type, as were blood samples collected from the kitchen counter and a telephone in the house being remodeled. A throw rug in Powell's kitchen contained a bloody shoe print that had the same lug-sole pattern as a bloody shoe print on the dining room carpet in the house being remodeled. The pattern may have been of a work boot.

Detective Wachter, assisted by Officer Sergio Guzman who acted as translator, interviewed defendant on October 26, 1990, before his arrest on the same day. Defendant denied that he knew Powell until he was shown her photograph. He denied having had any contact with Powell and said that he had never been in her yard or house. Defendant stated that he arrived at home by 5:30 p.m. the day Powell was murdered. He consented to a search of his apartment and gave the officers the clothes and cowboy boots that he said he

wore that day. The clothing was freshly laundered and folded in the closet. The clothes and boots contained no blood.

The Los Angeles County Deputy Medical Examiner, Irwin Golden, determined that Powell died from numerous fatal stab wounds to her upper body and multiple "through-and-through" stab wounds to her neck. Dr. Golden observed several small poke wounds on her breasts, right front shoulder, and right back shoulder; a slicing or slashing wound on each breast; and defensive wounds on her arms and hands. He testified the poke wounds were "very small, some appeared to be triangular, some were lengthwise, and appeared to be just nicks of the skin . . . compatible with the tip of a sharp instrument." The poke wounds on Powell's breasts and right back shoulder were inflicted while she was alive. The poke wounds on her right shoulder were inflicted at or near the time of death. The knife that was found lying on her chest could have inflicted the stab wounds.

There was no vaginal trauma or other physical evidence of a sexual assault. Powell was fully clothed in a blouse, brassiere, slacks, panties, and shoes. Powell's shirt contained multiple slits and cuts to the front, back, and sleeves. Her panties were blood-soaked, but not cut or torn.

### 2. The Defense Case

Defendant testified in his own defense and denied killing Powell. He stated that on the day of the murder, when defendant encountered Sloane near the driveway between the two houses, he had been coming from the garage and not the gate leading to Powell's backyard. Defendant denied telling Sloane he had been drinking and had been on Powell's property. He could not recall whether he told Sloane that he had recently been robbed.

Defendant testified he had three or four beers that day, but he did not tell Braziel to buy him beer. The work crew left the jobsite at 4:30 p.m. He was the last worker to leave. Before he left, he decided to swim in the pool. He had removed his shirt and boots when he heard screaming next door. Defendant walked to Powell's house, entered through the sliding glass back door, and found Powell lying in a "little bit of blood." He tried to lift her by her shoulders but saw that she had "too many wounds" and laid her back down. Defendant put his hand on the wall to balance himself as he stood. He returned to the jobsite and picked up the telephone. Defendant did not know whom to call because he was scared, and he did not know how to call 911. He washed up in the pool, redressed, and walked to the bus stop around 5:40 p.m.

Defendant arrived home at 5:45 p.m. He called his wife but did not tell her about the crime because he was afraid she would have been upset with him and would "bawl [him] out or something."

Defendant testified that he lied to police officers when they interviewed him and denied he had been in Powell's house because he thought he would be beaten by officers. Defendant testified that in his native Guatemala, the police are corrupt and often beat and torture people to obtain incriminating evidence. When officers told defendant his fingerprints were on the wall near Powell's body, he told them he might have been in Powell's house but was too drunk to remember.

A second pair of shoes taken from defendant's apartment did not match the shoe prints found at the crime scene or at the remodeling house.

### 3. *Rebuttal Evidence*

Defendant's "wife," Antonia Juventina Salguero,[3] testified that he generally wore tennis shoes to work. Defendant wore his brown boots only on special occasions and never to work. Defendant told Salguero that he had taken off his shoes and socks and went into the pool about 5:35 p.m. Defendant did not tell Salguero that he went into Powell's house until about five or six months after the murder. Salguero admitted that she would become angry when defendant helped people and had threatened to leave him.

Manuel Paz, defendant's nephew, told police that on the day of the murder, defendant had arrived at his apartment about 6:30 p.m. and was drunk.

### 4. *Surrebuttal Evidence*

When defendant tried to help Powell, he touched a wall with his left hand. He did not remember how he positioned himself around Powell's body.

### B. *Penalty Phase*

### 1. *The Prosecution's Evidence*

The prosecution presented victim impact evidence through the testimony of Powell's father, Sims, and Powell's ex-boyfriend, Hector Tobar.

The prosecution presented additional evidence of defendant's conduct involving force or threats of force. Angela Guerra de Maderos, who lived in a small town in the Republic of Guatemala, testified that one evening around the year 1986, she was walking home through the forest accompanied by 12-year-old Edgar Ramirez. Defendant, whom she had known since he was

---

[3] The trial court found the marital privilege did not apply because defendant and Salguero had never been formally married.

born, jumped in front of them, wielded a machete, and prevented them from going forward. He wore a bandanna over his face. De Maderos ran into a field, and Ramirez ran to de Maderos's house for help. Defendant caught up with de Maderos and told her, "You're here with a guerilla. I am going to rape you and I'm going to kill you." Defendant kicked de Maderos, causing her to fall, and poked her throat with the machete, causing numerous puncture marks. His bandanna fell off during the struggle. Defendant left when de Maderos's husband and son approached and fired a shot. He left behind his machete sheath, with the initials F.G. De Maderos did not report the attack to the police because she was afraid that they would not investigate the incident and that defendant would kill her. The day after the attack, defendant told Ramirez, "I did scare you yesterday, didn't I?" Ramirez responded, "How come you did that to us unjustly, unfairly, like that?" Defendant just laughed and smiled at him.

### 2. *The Defense Evidence*

Defendant worked as a medic, police officer, and farmer in Guatemala. He often helped his family and members of his community when they were sick, injured, or hungry. He took injured people to the hospital, gave blood when needed, and visited people by horseback to give them medical injections, when needed.

Defendant's wife, Salguero, testified that defendant was accused of shooting someone whom he had tried to help. After this, Salguero told defendant that if he continued to help people, she would no longer love him.

## II. DISCUSSION

### A. *Pretrial and Jury Selection Issues*

#### 1. *Denial of Funding Request for an Alcohol-induced Electroencephalogram Test*

Defendant contends the trial court erroneously denied his multiple requests for funding to conduct an alcohol-induced electroencephalogram (EEG) test, thus violating his statutory rights under section 987.9 and various state and federal constitutional rights.[4]

---

[4] Regarding this claim and most other claims raised on appeal, defendant also argues that the asserted error or misconduct infringed various of his constitutional rights to a fair and reliable trial. In most of those instances in which defendant raised the issue at trial, he failed to explicitly make some or all of the constitutional arguments he now urges on appeal. Unless otherwise indicated, the appellate claim is of a kind that either required no action by defendant to preserve it (e.g., an erroneous instruction affecting defendant's substantial rights) or

### a. *Procedural Background*

On three occasions, defendant sought funding to conduct an alcohol-induced EEG on the basis that he may have suffered an alcohol-induced psychosis or allergic reaction on the day of Powell's murder due to his ingestion of alcohol, and as a result was unable to form the requisite specific intent of the charged offense. The court denied each request because it doubted whether the test results would be admissible, whether the test could duplicate a person's reactions to alcohol on a previous occasion, and whether this particular test was the only test that could determine allergic reactions to alcohol. The court noted that a defense psychiatrist had already received $2000, and it approved 10 additional hours for otherwise approved investigations.

### b. *Applicable Law*

■ An indigent defendant has a statutory and constitutional right to ancillary services reasonably necessary to prepare a defense. (§ 987.9, subd. (a); *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319–320 [204 Cal.Rptr. 165, 682 P.2d 360].) The defendant has the burden of demonstrating the need for the requested services. (*Corenevsky v. Superior Court, supra,* at p. 320.) The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary. (*Ibid.*) On appeal, a trial court's order on a motion for ancillary services is reviewed for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 234 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *Corenevsky v. Superior Court, supra,* at p. 321.) We find no such abuse in this case.

Defendant failed to demonstrate the test was reasonably necessary for his defense. Counsel provided no facts showing defendant blacked out or suffered any memory loss due to his ingestion of alcohol on the day Powell was murdered. Thus, defendant's assertion that he may have suffered a pathological reaction to alcohol that induced a state of unconsciousness or amnesia on the day Powell was murdered is mere speculation. Also, as the trial court

---

involved application of the same facts or legal standards the defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional *legal consequence* of violating the Constitution. To that extent, defendant has not forfeited his new constitutional claims on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) In the latter instance, except where we otherwise conclude, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of defendant's newly asserted constitutional claim as well. No separate constitutional discussion is required in such cases, and we therefore provide none.

noted, counsel failed to establish how the proposed test conditions would duplicate the circumstances on the day of the murder and yield relevant and reliable information. Indeed, counsel provided no explanation for his request that defendant be administered tequila during the test even though defendant admitted he drank *beer* on the day of the murder.

Contrary to defendant's argument, *Ake v. Oklahoma* (1985) 470 U.S. 68 [84 L.Ed.2d 53, 105 S.Ct. 1087] does not compel a different conclusion. In *Ake*, the Supreme Court held an indigent defendant is entitled to access to a psychiatrist for assistance in preparing a defense when he makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial. (*Id.* at p. 83.) Defendant presented no evidence that he suffered a pathological reaction to alcohol on the day of Powell's murder. The record shows defendant had access to a psychiatrist, as *Ake* requires: a defense psychiatrist had received $2000 in court-approved funds, and the trial court approved an additional 10 hours for further investigation.

Moreover, any error in denying defendant's request for funds was harmless. Defendant's palm prints and fingerprints were found in Powell's blood inside her utility room and also on the countertop in the remodeling site. Defendant testified he went inside Powell's house when he heard screaming. He found Powell lying in a "little bit of blood." He tried to lift Powell by her shoulders but laid her back down when he realized she was too severely injured. Defendant returned to the remodeling site but did not call the police because he did not know how to dial 911. The level of detail in defendant's rendition of the facts on the day of Powell's murder belies any claim that alcohol rendered him unconscious. In addition, although defendant's nephew and sister-in-law testified they had observed defendant drink beer previously, there was no evidence that defendant had ever suffered a psychotic or allergic reaction to alcohol. Accordingly, defendant has failed to establish he was deprived of a fair trial or otherwise suffered prejudice from the denial of his request for funds. (*People v. Mendoza* (2000) 24 Cal.4th 130, 159 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

2. *Suppression Motion*

Defendant claims the trial court erred in denying his motion to suppress statements he made during two police interviews and all evidence obtained as a result of those interviews. He argues that his statements were involuntary.

### a. *Factual and Procedural Background*

#### (1) *The Interviews*

##### (i) *October 26, 1990 Interview*

On October 26, 1990, Los Angeles Police Detectives Kurt Wachter and Charlie Brown approached defendant at the office of his employer, D'Erections, the company that was remodeling the house next door to Powell at the time of her murder. Defendant spoke Spanish and not English, but another employee translated for them. They asked defendant if he would accompany them to the police station for questioning about a crime that was committed the previous day. They said he was not under arrest and would not be handcuffed. Defendant agreed. The detectives drove him, unhandcuffed, to the West Los Angeles police station in an unmarked detective car and placed him, still unhandcuffed, in an interrogation room. There, with Detective Sergio Guzman translating, Wachter interviewed defendant. Defendant was concerned but calm. Throughout the interview, all participants maintained a relatively conversational tone.

Wachter thanked defendant for coming to the station and advised him that he was there voluntarily and not in custody or under arrest. He advised defendant of his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).) When the translator asked defendant if he wanted to give up his right to remain silent and speak with the detective, defendant answered, "Yes. Yes." The translator then asked him if he wanted to give up his right to speak with an attorney and have one present during questioning. Defendant said he did not need an attorney and did not have money to pay an attorney.

At Detective Wachter's request, the translator again explained to defendant his *Miranda* rights. The interview continued as follows:

"[Translator]: Okay, do you wish to give up the right to remain silent?

"[Defendant]: Yes.

"[Translator]: Do you wish to give up the right to speak an, with an attorney ha . . . and to have him present during your questioning?

"[Defendant]: Okay.

"[Translator]: Okay. What is okay, what? That you don't want the, the, the, the attorney?

"[Defendant]: Uh, I, attorney, no, because I don't have any money, right?

"[Translator]: I, I know, but also, one can be appointed for you without cost before you are questioned.

"[Defendant]: And I don't have to pay for him?

"[Translator]: Yes.

"[Defendant]: And I don't pay? But since, since I don't, I don't have, uh, a problem to, to have any attorney, I don't [UI][5] that is I am, I am . . .

"[Translator]: [ENG] Yeah, I don't have money for an attorney, but however I have no problem. I, I have no . . . there is no problem going on with me because, 'cause I did nothing wrong or something so there's no need for me having an attorney.

"[Wachter]: Okay, just understand, uh, please make him understand that he has to answer the question yes or no.

"[Translator]: [SPAN] Oh, okay, then, the thing is we need to know that neither [*sic*] you say whether or not you want the attorney here before you are questioned. And as I say, one can be appointed for you without cost before . . .

"[Defendant]: That, that is fine, well then, appoint one for me.

"[Translator]: Huh?

"[Defendant]: Well that is fine, for him to be appointed for me [UI] have an attorney, right?

"[Translator]: Then, do you want an attorney?

"[Defendant]: Yes, I want an attorney.

"[Translator]: [ENG] He said, 'Yes, I want an attorney.'

---

[5] The transcript from this taped interview indicates that "UI" denotes an "unintelligible" response. In addition, "ENG" indicates that the dialogue recorded on the tape following this notation is in English until the notation "SPAN" appears, after which the dialogue is in Spanish until the next "ENG" notation appears. All of defendant's statements are translations from Spanish.

"[Wachter]: Okay, understand this, if he wants the attorney and doesn't wish to speak to us, then from the information that we have, he's going to be arrested for murder and we'll book him into jail right now.

"[Translator]: [SPAN] Okay, I want you to . . . the detective says that I want, that it is, that you (should) know about this. Then if you want the attorney here and you don't want to speak to the detectives about yesterday's case then I want you to . . . they have enough in . . . information about what oc . . . occurred yesterday . . .

"[Defendant]: Uh-huh.

"[Translator]: . . . that right now they are going to arrest you. They are going to put you in jail for the, for the death of the lady [UI].

"[Defendant]: That is, the thing is, is that I didn't understand you, right? I understand you, right? That, well, if I ask for an attorney for myself, but since I'm not guilty of anything, nor do I know, nor do I know what, what that is, then, I need to speak to them. That they tell me, they tell me what, what . . .

"[Translator]: What? Speak with whom, then? The detectives?

"[Defendant]: With them, with them.

"[Translator]: That, that's why I'm here. I, I [UI] am . . .

"[Defendant]: [UI]

"[Translator]: [UI]

"[Defendant]: Then [UI] rather speak with them and [UI].

"[Translator]: [UI] Spanish, that's why I'm, I'm here helping you.

"[Defendant]: [UI] as I say, the thing is, I don't, don't know, I am, I don't know anything about that. Uh-huh.

"[Translator]: Don't, don't you know anything about what happened, it, of what happened?

"[Defendant]: I don't know, I don't know because I, I go in to work, uh, at eight. I go to the office to work.

"[Translator]: Okay, but, sir, you are telling me about what happened yesterday. I don't want you to tell me anything until you, until, that, that, that, you say that you didn't want the attorney here, but you also have your right, so, to have the attorney. But as I say, they have enough information about you . . .

"[Defendant]: Uh-huh.

"[Translator]: . . . about what happened yesterday . . .

"[Defendant]: Uh-huh.

"[Translator]: . . . and if you want the attorney present here, then they are going to go, put you in jail.

"[Defendant]: I know, I know what they are telling me, I know. But, as I say, right? I would rather speak to them, and I don't want an attorney. I don't want an attorney."

The detectives then proceeded to question defendant. After defendant was shown a photograph of Powell, he admitted that he had seen her "go by the jobsite." But defendant said he was "not on familiar terms with her" and denied that he had ever been in Powell's house or on her property. He further denied that he ever approached her car or spoke to her.

The detectives asked defendant about the clothes he wore at the jobsite on the previous day. Defendant offered to take the detectives to his apartment and retrieve the clothes he wore to work that day. He then asked for directions to the police station and informed the detectives he would go to his apartment, get his clothes, and come back. The translator told defendant the detectives would accompany him to his apartment. Defendant later signed a form stating that he voluntarily consented to the detectives searching his residence.

### (ii) *October 30, 1990 Interview*

Defendant was initially arrested and placed in custody after he retrieved his clothes from his apartment following the first interview on October 26, 1990. Four days later, on October 30, 1990, Detective Wachter interviewed defendant again. He again advised defendant of his *Miranda* rights, and defendant waived them. When asked if he wanted an attorney, defendant replied, "No, because it's a waste (of money) for the Government and everything, you understand me? And I prefer, well, by himself [*sic*], right?"

Detective Wachter described defendant as self-assured and forceful with his responses. Defendant again denied that he ever spoke with Powell but admitted he may have gone into her yard, possibly at the direction of his supervisor. The translator informed defendant that his fingerprints were left in Powell's blood in her house and at the jobsite. Defendant responded, "My prints are there?" and "I don't think that my prints are there." He maintained that he had not entered Powell's house.

Defendant later stated that he might have been drunk and gone into Powell's house after someone else killed her. He stated he was not capable of "killing that person." He then suggested, "perhaps maybe, maybe I went in but maybe I found her dead." "And perhaps, and perhaps I, I was too drunk when I went in and perhaps I thought she wasn't dead and, and I saw her perhaps, I don't know." He said he did not remember but he might have tried to pick her up to see if she was alive. He saw no one in the house or running from the house. Defendant drank "maybe some, some five" beers or more on the day Powell was murdered, but he also said he did not recall getting drunk.

Defendant was arraigned later that day.

### (2) *The Suppression Hearing*

At the suppression hearing, defense counsel conceded that there was no *Miranda* issue and that the detectives complied with *Miranda* during their interrogation of defendant. But he argued defendant's waiver of his *Miranda* rights was coerced and his statements were involuntary because the detectives threatened to arrest him and failed to stop questioning him once he requested counsel. Also, counsel argued defendant's waiver and statements were involuntary because he believed he had no choice but to submit to the detectives' questioning based on his experience with the police in his native Guatemala who would "beat or kill" or "put a cattle prod on" those who did not cooperate during an interrogation. The prosecutor countered that defendant's waiver and statements were not coerced and that defendant's experiences in Guatemala were irrelevant to a determination of the validity of his waiver.

The trial court first determined that the prosecution had sustained its burden of showing defendant had been advised of and had waived his *Miranda* rights. Counsel nonetheless moved the court to permit Dr. Jose La Calle to testify "about the way that people, such as [defendant], view the police in the context of Guatemala" and about defendant's understanding that he had no choice but to talk to the officers.

After considering counsel's arguments, listening to the audiotape, and reviewing the transcript of the first interview, the trial court ruled that

defendant had been properly advised of and had waived his *Miranda* rights. It specifically found that (1) the officers' conduct during their interrogation of defendant complied with *Miranda*; (2) defendant's waiver of *Miranda* rights and his statements were voluntary; and (3) defendant spoke with the detectives in an effort to exculpate himself. The court stated, "[T]here is absolutely no question in this court's mind that this defendant knew exactly what was taking place," was "not an unintelligent person," and "appreciated some very subtle nuances in the questions that were asked of him." It found the proffered testimony of Dr. La Calle irrelevant.

Defense counsel also moved to suppress defendant's statements from the October 30 interview on the grounds that they were involuntary because they derived from the first interview, and because he was not arraigned within the statutory deadline. (§ 825.)[6] The trial court excluded the October 30 statements from the prosecution's case-in-chief because of the four-day delay in arraignment, but permitted their use for impeachment.

### b. *The Applicable Legal Standards*

#### (1) *Miranda*

In *Miranda, supra,* 384 U.S. 436, the United States Supreme Court "recogniz[ed] that any statement obtained by an officer from a suspect during custodial interrogation may be potentially involuntary because such questioning may be coercive" and "held that such a statement may be admitted in evidence only if the officer advises the suspect of both his or her right to remain silent and the right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer." (*People v. Neal* (2003) 31 Cal.4th 63, 67 [1 Cal.Rptr.3d 650, 72 P.3d 280].) The *Miranda* safeguards apply to confessions and "statements which amount to 'admissions' of part or all of an offense" regardless of whether they are exculpatory or inculpatory in nature. (*Miranda, supra,* 384 U.S. at pp. 444, 476–477.) A statement obtained in violation of *Miranda* may not be admitted in the prosecution's case-in-chief but, if voluntary, may be admitted to impeach the defendant. (*Harris v. New York* (1971) 401 U.S. 222, 223–224 [28 L.Ed.2d 1, 91 S.Ct. 643]; *People v. Neal, supra,* 31 Cal.4th at p. 67.)

On appeal, we review independently a trial court's ruling on a motion to suppress a statement under *Miranda*. (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46].) In doing so, however, "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of

---

[6] Section 825 requires that a defendant be arraigned before a magistrate "without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays."

credibility, if supported by substantial evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

### (2) *Voluntariness*

■ A defendant's statements challenged as involuntary are inadmissible at trial unless the prosecution proves by a preponderance of the evidence that they were voluntary. (*Lego v. Twomey* (1972) 404 U.S. 477, 487–489 [30 L.Ed.2d 618, 92 S.Ct. 619]; *Jackson v. Denno* (1964) 378 U.S. 368, 385–386 [12 L.Ed.2d 908, 84 S.Ct. 1774]; *People v. Markham* (1989) 49 Cal.3d 63, 69–71 [260 Cal.Rptr. 273, 775 P.2d 1042].) "The due process [voluntariness] test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " (*Dickerson v. United States* (2000) 530 U.S. 428, 434 [147 L.Ed.2d 405, 120 S.Ct. 2326], quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 93 S.Ct. 2041].) This test "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." (*Dickerson*, at p. 434.) We make the same inquiry to determine the voluntariness of a *Miranda* waiver. (*Colorado v. Connelly* (1986) 479 U.S. 157, 169–170 [93 L.Ed.2d 473, 107 S.Ct. 515] ["There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context"].) "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." (*Id.* at p. 167; see also *People v. Williams* (1997) 16 Cal.4th 635, 659 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Coercive police activity, however, " 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404–405 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

We review independently a trial court's determinations as to whether coercive police activity was present and whether the statement was voluntary. (*People v. Jones* (1998) 17 Cal.4th 279, 296 [70 Cal.Rptr.2d 793, 949 P.2d 890].) We review the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, for substantial evidence. (*Ibid.*) "[T]o the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence." (*People v. Weaver* (2001) 26 Cal.4th 876, 921 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

### c. *Issue Preservation*

At trial, defendant did not argue that his statements were obtained in violation of *Miranda*. Defense counsel apparently made a tactical decision to

waive any *Miranda* issue, a decision that appears reasonable on the facts of this case. Because defendant left his palm prints and fingerprints in Powell's blood at both the crime scene and the house being remodeled, counsel may reasonably have believed that defendant had to testify at trial to explain those fingerprints. Testifying would place his credibility at issue. If counsel succeeded in having defendant's statements excluded solely under *Miranda,* they still would be admissible to impeach him. (*Harris v. New York, supra,* 401 U.S. at pp. 223–224; *People v. Neal, supra,* 31 Cal.4th at p. 67.) Only if counsel could convince the court that the statements were *involuntary* would they be excluded for all purposes, including impeachment. (*Jackson v. Denno, supra,* 378 U.S. at pp. 385–386; *People v. Neal, supra,* at pp. 67, 79.) Therefore, if defendant intended to testify to try to explain the fingerprints and palm prints, counsel's motion to suppress would gain defendant nothing unless he established the statements were involuntary, rather than solely the product of a *Miranda* violation.

Accordingly, on appeal, defendant contends that his statements should have been suppressed for all purposes because they were involuntary under the totality of the circumstances. Defendant asserts these circumstances include Detective Wachter's questioning after he invoked his right to counsel, Wachter's threat of arrest, and defendant's experiences in his native Guatemala. The People argue defendant has forfeited the issue regarding any improper questioning by Detective Wachter. The People are correct, but only in part.

Although counsel waived any *Miranda* issue arising from police conduct during the interrogation, he specifically asserted Detective Wachter's conduct was a factor that rendered his statements involuntary under the totality of the circumstances. Therefore, although defendant may not, and does not, rely solely on *Miranda* for relief, he may rely on all of the circumstances, including the continued questioning, as they relate to the voluntariness issue.

### d. *Analysis*

#### (1) *October 26 Statements*

As stated, defendant has waived any *Miranda* issues as grounds for suppressing his statements from the October 26 interview. The only issue presented is whether defendant's statements were voluntary. Defendant contends his statements from the October 26 interview were involuntary because (1) Detective Wachter failed to stop questioning him after he invoked his right to counsel; (2) Wachter threatened to arrest defendant and put him in jail if he did not speak with the detectives; and (3) defendant's experiences in his native Guatemala affected his understanding of the interrogation. After reviewing the entire record independently, we disagree.

Defendant first contends the detective's failure to stop the interview when he requested counsel was coercive and rendered his statement involuntary because it led him to believe that his rights were meaningless and that he had to speak with the detectives. "While the fact that a statement was obtained despite the defendant's invocation of the right to counsel is one of the circumstances we consider [in determining whether a statement was voluntary], it . . . is not dispositive." (*People v. Bradford* (1977) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929 P.2d 544]; see also *People v. Neal, supra,* 31 Cal.4th at pp. 81–85 [officer's continued interrogation of defendant after defendant invoked his right to counsel was one of three circumstances considered in determining voluntariness of subsequent confessions].)

Defendant had voluntarily accompanied the detectives to the police station from his place of employment. Before invoking his right to counsel, defendant had repeatedly expressed his willingness to cooperate with the detectives and claimed to have no need for an attorney because he did not have "a problem." Once defendant invoked his right to counsel and was threatened with arrest, his desire to cooperate with the detectives remained unchanged. He again stated he did not need an attorney because he did not know anything about the murder. As such, the record does not establish that defendant was affected in any manner or that his free will was overborne by the continued interrogation by Detective Wachter. There is no causal connection between the continued interrogation of defendant and his purported belief that he was required to cooperate during the interview. (*People v. Maury, supra,* 30 Cal.4th at pp. 404–405.)

Defendant next contends Detective Wachter coerced him into making his statements by falsely threatening to arrest him. Wachter testified at the suppression hearing that he did not believe he had probable cause to arrest defendant until after he initially interviewed defendant and searched his apartment. Defendant contends Wachter's threat was particularly coercive because he was confused and lacked knowledge about our legal system. Nothing in the record, however, suggests defendant was coerced. He did not become confused or otherwise lose his composure after Wachter said he would arrest him. (See, e.g., *People v. Jones, supra,* 17 Cal.4th at p. 298 ["no indication that defendant was frightened into making a statement that was both involuntary and unreliable" by the detective's "persistent references to the dire consequences he was facing"].) To the contrary, defendant remained eager to talk throughout the interview. As the detectives were about to conclude the interview, defendant offered to retrieve his clothes from his home and return to the police station. Clearly, he did not feel as if he was under arrest. When the translator clarified that the detectives would accompany defendant to his home, he said, without hesitation, "Okay, fine." He then asked if he could let his wife know "what's going on." Such conduct belies any claim by defendant that he felt coerced or feared the detectives would mistreat or torture him. We

agree with the trial court's assessment that "defendant knew exactly what was taking place" during the interview. He appreciated subtle nuances in the questions and intelligently answered some poorly phrased compound questions.

The sole cause appearing in the record for defendant's cooperation during the interview was his desire to exculpate himself. *People v. Hayes* (1985) 169 Cal.App.3d 898, 905–908 [215 Cal.Rptr. 595], is factually similar. In that case, after the 16-year-old suspect stated, " ' " 'I want to talk to a lawyer,' " ' " the detective immediately informed him that he (the suspect) was going to be booked for first degree murder, detained at juvenile hall, and certified as an adult in the case. (*Id.* at pp. 906–907 & fn. 4.) As the detective began to leave the interrogation room, the suspect told the detective that he " 'couldn't do that to him' " and that he " 'hadn't killed anybody and . . . he would show [the detective] where the gun was.' " (*Id.* at p. 907, fn. 4.) The Court of Appeal found the detective's statements informing the suspect what was going to happen to him after he invoked his right to counsel were not made in an attempt to elicit statements from the suspect. (*Id.* at p. 907.) After invoking his right to counsel, the suspect was motivated to speak with the detective, not by coercion, but rather by his desire to clear himself of any suspicion. (*Id.* at pp. 907–908; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58 [17 Cal.Rptr.3d 710, 96 P.3d 30] ["His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information"].) Therefore, the court held the suspect's change of heart in desiring to speak with the detective and his subsequent statements were voluntarily made. (*Id.* at p. 908.)

In this case, Wachter responded to defendant in much the same manner as the detective responded to the juvenile suspect in *Hayes*—he essentially informed defendant that if he did not speak with him that he (defendant) would be arrested and charged with Powell's murder. Defendant then decided to speak with the detectives, in an effort, the record indicates, to clear himself of suspicion. He denied that he knew Powell until he was shown a photograph of her and stated he "[didn't] know anything about that." He further denied that the had ever been in Powell's house or yard. Defendant's behavior is not the behavior of one whose free will has been overborne. Therefore, we discern no causal link between the detective's threat of arrest and defendant's subsequent statements and waiver of his right to counsel. (*People v. Maury, supra,* 30 Cal.4th at pp. 404–405.)

Further, that Detective Wachter may have informed defendant *falsely* that he had sufficient probable cause to arrest him for Powell's murder did not render defendant's subsequent waiver of his right to counsel and statements

involuntary. Although false statements made by the police during questioning may affect the voluntariness of a defendant's confession, " 'they are not per se sufficient to make it involuntary.' " (*People v. Farnam* (2002) 28 Cal.4th 107, 182 [121 Cal.Rptr.2d 106, 47 P.3d 988], quoting *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [74 Cal.Rptr.2d 212, 954 P.2d 475].) A finding of involuntariness is unwarranted if the deception is not of a type reasonably likely to produce a false statement. (*People v. Farnam, supra,* at p. 182.) Here, the detective's statement that there was sufficient probable cause to arrest defendant was not likely to produce a false statement. (See, e.g., *People v. Jones, supra,* 17 Cal.4th at p. 299 [detective's deceptive statements to defendant implying that he knew more than he did or could prove more than he could were not reasonably likely to procure a false statement].) A finding of involuntariness on this basis, therefore, is unwarranted.

Finally, to the extent that defendant contends his statements and any waiver were involuntary based on his experiences in Guatemala, we disagree. "The due process inquiry focuses on the alleged wrongful and coercive actions of the state . . . and not the mental state of defendant." (*People v. Weaver, supra,* 26 Cal.4th at p. 921, citing *Colorado v. Connelly, supra,* 479 U.S. at p. 165; see also *People v. Bradford, supra,* 14 Cal.4th at p. 1041 ["The Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.' "].)

At the suppression hearing, counsel sought to present evidence that defendant's experiences in Guatemala affected his understanding of the interrogation. Defendant would have testified that he believed he had to submit to questioning by the detectives in this case because in his native Guatemala, the police would torture or kill him if he did not cooperate during an interrogation. Also, he would have testified he had no understanding of the legal system in this country. Dr. La Calle, a psychologist, would have testified on the cultural conditions of Guatemala and the general manner in which the police mistreat people. Based on his interview of defendant, Dr. La Calle also would have testified that because of defendant's experience with the Guatemalan police, he (defendant) believed he could not refuse to answer the detectives' questions in this case.

Defendant's proffered testimony, however, would have established only that his " 'pressure' sprang from within [himself]." (*People v. Mickey* (1991) 54 Cal.3d 612, 650 [286 Cal.Rptr. 801, 818 P.2d 84].) As a matter of law, this involved no state coercion. (*Ibid.*) No causal link existed between the defendant's internal pressure from his experiences with the Guatemalan police and any police activity in this case.

Accordingly, based on our examination of the totality of the circumstances, we conclude defendant's statements from the October 26 interview were

voluntary and therefore admissible for impeachment. (*Jackson v. Denno, supra,* 378 U.S. at pp. 385–386; *People v. Markham, supra,* 49 Cal.3d at pp. 69–71.)

### (2) *October 30 Statements*

On October 30, 1990, four days after defendant was initially interviewed and arrested, Detective Wachter conducted a second interview. Defendant was given and waived his *Miranda* rights before answering any questions.

Counsel moved to suppress defendant's statements from that interview on the ground they were involuntary as a result of the coercive nature of his interview on October 26 and the delay in his arraignment. The trial court granted the motion, in part, excluding this statement from the prosecution's case-in-chief because of defendant's delayed arraignment, but permitting its use for impeachment. Defendant now claims his statement should have been excluded for all purposes, including impeachment. We disagree.

We have already found that the statements on October 26 were voluntary. Nothing about the circumstances surrounding the October 30 statements suggests that what was voluntary four days earlier had become involuntary. The delay in arraignment was not itself coercive. Defendant was as cooperative in talking to the police the second time as he was the first time. It remains clear that defendant still wanted to give the police an exculpatory statement. This was not a case of the police effectively coercing a confession, as in *People v. Neal, supra,* 31 Cal.4th 63, but of defendant voluntarily giving statements denying his involvement in the crime.

### (3) *Defendant's Consent to Search His Apartment*

During the October 26 interview, defendant consented to a search of his apartment by the detectives. He gave the detectives the clothes he wore to work on the day of Powell's murder. Defendant moved to suppress this evidence on the ground his consent was involuntary and obtained during the coercive first interview. The trial court denied his motion.

Defendant renews his claim on appeal. Because we have concluded defendant's statements from the October 26 interview, including his consent to search his apartment, were voluntarily made (see *ante,* at pp. 1094–1098),

defendant's consent did not derive from an involuntary or coerced source. Accordingly, the evidence seized during the search was not excludable on this basis.[7]

### 3. *Challenges for Cause*

Defendant contends the court erred in overruling his challenges to eight prospective jurors for bias in favor of the death penalty. "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so." (*People v. Williams, supra,* 16 Cal.4th at p. 667.) Here, defendant did not exhaust his peremptory challenges for the sitting jury, although he did so for the alternate jurors. Additionally, defendant did not object to the jury as it was finally constituted. Therefore, he has forfeited these claims for appellate review.

In any event, we may reject defendant's claims without examining the merits of his challenges for cause because he cannot show prejudice. "To prevail on such a claim, defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury." (*People v. Yeoman, supra,* 31 Cal.4th at p. 114.) In this case, none of the prospective jurors defendant challenged sat on the jury. Defendant peremptorily challenged six of the eight prospective jurors he had challenged for cause. The remaining two were never called into the jury box. Therefore, because defendant did not challenge any sitting juror for cause, he cannot show the court's rulings affected his right to an impartial jury. (*Ibid.* [to obtain relief on appeal from the erroneous denial of a challenge for cause, the record must show the defendant challenged a sitting juror]; see also *Ross v. Oklahoma* (1988) 487 U.S. 81, 85–91 [101 L.Ed.2d 80, 108 S.Ct. 2273].)

### 4. *Batson/Wheeler*

During voir dire, defense counsel timely objected under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*), to the prosecutor's peremptory challenges of three Hispanic and three African-American prospective jurors. As to counsel's objections to the first Hispanic prospective juror and the first African-American prospective juror, the trial court ruled that defendant had failed to establish a prima facie case of

---

[7] Defendant additionally contends he was denied a fair hearing on his suppression motion because the trial court "err[ed] in distinguishing admissions from confessions." Even if the trial court erred, however, we have independently concluded defendant's statements were voluntary and thus properly admitted. Accordingly, his contention fails.

discrimination as to each group. With respect to the remaining objections, the court asked the prosecutor to justify his peremptory challenges. The prosecutor did so, and the court accepted the explanations as genuine and race neutral on each occasion.

Ultimately, no jurors identified as Hispanic and two jurors identified as African-Americans were among the sitting jurors. Defendant contends the court erred in overruling his objections.

■ Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) Recently, "the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. 'First, the defendant must make out a prima facie case by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622], quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416], fn. omitted (*Johnson*).) The high court clarified that "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra,* at p. 170 [125 S.Ct. at p. 2417], reversing in part *People v. Johnson* (2003) 30 Cal.4th 1302, 1318 [1 Cal.Rptr.3d 1, 71 P.3d 270] [requiring the defendant to "show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias"].)

■ In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, "the trial court 'must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ." [Citation.]' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*Ibid.*) Inquiry by the trial court is

not even required. (*Id.* at p. 920.) "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*Id.* at p. 924.) A reason that makes no sense is nonetheless "sincere and legitimate" as long as it does not deny equal protection. (*Ibid.*)

### a. Asserted Trial Court Error in Failing to Find a Prima Facie Case of Discrimination

Defendant argues first that the court erred in finding no prima facie case of discrimination when the prosecutor used peremptory challenges to excuse Prospective Jurors R.M., a Hispanic, and L.B., an African-American. We disagree.

"When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." (*People v. Farnam, supra,* 28 Cal.4th at p. 135.)

As a preliminary matter, in supplemental briefing defendant asserts that because the trial court did not state the standard it used to determine whether he established a prima facie case of discrimination, we must presume the trial court used the improper more-likely-than-not standard under *People v. Johnson.* (See *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727] [trial court is presumed to follow established law absent evidence to the contrary].) Therefore, he asks that we independently determine whether he established a prima facie case of discrimination using the reasonable inference test under *Batson.* As in *People v. Cornwell,* "[r]egardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson* . . . [we] are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwell, supra,* 37 Cal.4th at p. 73.) We conclude the record fails to support "an inference that the prosecutor excused [any] juror on the basis of race." (*Ibid.*)

As to Prospective Juror R.M., defense counsel sought to establish a prima facie case of discrimination based solely on the circumstance that R.M. was the only Hispanic sitting in the jury box, leaving only two other Hispanics on the entire panel. This circumstance, standing alone, is not dispositive on the issue of whether defendant established a prima facie case. (*People v.*

*Crittenden* (1994) 9 Cal.4th 83, 119 [36 Cal.Rptr.2d 474, 885 P.2d 887]; but see *Johnson, supra,* 545 U.S. at p. 173 [125 S.Ct. at p. 2419] [the removal of all three African-American prospective jurors established a prima facie case].) Moreover, the record discloses reasons other than racial bias for any prosecutor to challenge Prospective Juror R.M. He indicated on his questionnaire that a person's voluntary intoxication should automatically be considered a defense, or reduce his or her culpability, if that person commits a crime "because your mind is not where it [is] suppose[d] to be." The prosecutor volunteered that this response was something he considered in excusing R.M. He may reasonably have believed that R.M. would have difficulty setting his belief aside and evaluating the evidence in this case because defendant claimed he was intoxicated at the time of Powell's murder. Defendant contends the trial court rejected this possibility because it stated that the juror's attitude towards intoxication was "not disqualifying at all." But it may merely have meant the attitude would not support a challenge for cause, not that a prosecutor had to ignore it. "The circumstance that the juror was not subject to exclusion for cause certainly did not support an inference that the exercise of a peremptory challenge against [the juror] was motivated by group bias." (*People v. Cornwell, supra,* 37 Cal.4th at p. 70 [33 Cal.Rptr.3d 1, 117 P.3d 622].) In addition, the trial court also said that it would have excused the juror itself. It said that R.M. had "an attitude that projects itself as clearly as a ringing bell" and "some kind of chip on his shoulder or some attitude here that's very disturbing."

With respect to Prospective Juror L.B., defense counsel sought to establish a prima facie case of discrimination because the prosecutor challenged a second African-American prospective juror.[8] As stated, this showing is not dispositive of whether defendant established a prima facie case. (*People v. Crittenden, supra,* 9 Cal.4th at p. 119.) As with Prospective Juror R.M., the record reveals reasons other than racial discrimination for any prosecutor to challenge this prospective juror. L.B. had indicated that a cousin was treated unfairly by police when the cousin was arrested for carrying a gun in a Mercedes he was driving. The officer had asked L.B.'s cousin if he had stolen the vehicle. L.B., who was a passenger in the Mercedes, believed her cousin was treated unfairly by the police based on this question. She also believed her cousin was treated unfairly by the judicial system regarding this incident. In addition, L.B. responded on her questionnaire that she did not let people tell her what to do and that she had "very strong opinions." She also questioned whether she could remain objective in judging a person's credibility. Even though L.B. gave assurances that she could evaluate the evidence objectively, based on these responses, the prosecutor reasonably might have been concerned with L.B.'s negative views of the police and the judicial system

---

[8] Defense counsel conceded the prosecutor's challenge to the first African-American prospective juror was proper and did not object.

based on the incident with her cousin and her self-described strong personality, and challenged her on these bases.

Relying on *Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859], defendant further argues the trial court impliedly found that he established a prima facie case of discrimination when it considered and purportedly rejected the prosecutor's explanation that he excused Prospective Juror R.M. because he believed voluntary intoxication should automatically be a defense to a crime. In *Hernandez,* a plurality of the United States Supreme Court held that, although no express finding of a prima facie case had been made, the issue of whether a prima facie case of discrimination had been made became moot once the prosecutor volunteered his reasons for exercising his peremptory challenges. (*Ibid.*) Defendant's reliance on *Hernandez* is misplaced. At the conclusion of the hearing, unlike in *Hernandez,* the trial court expressly found that a prima facie case of discrimination was *not* established and impliedly found that the prosecutor's proffered reason was genuine. As we explained, the trial court's remark that R.M.'s belief was not "necessarily disqualifying" may have meant his attitude did not support a challenge for cause. In any event, the remark did not support an inference that the prosecutor was racially biased in challenging R.M. or that the trial court rejected the prosecutor's explanation as implausible.

Even assuming the trial court did find a prima facie case of discrimination at this point, defendant is not entitled to relief. The trial court made a sincere and reasoned effort to evaluate the prosecutor's race-neutral reason for challenging R.M., and substantial evidence supports the trial court's implied finding that the prosecutor's reason was genuine and nondiscriminatory. (*People v. McDermott* (2001) 28 Cal.4th 946, 970 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

Defendant next argues that when the prosecutor's explanation is compared with the responses of certain other jurors, the prosecutor's discriminatory intent is apparent. He relies on *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*) (discussed *post,* at pp. 1104–1106) in asking us to perform a comparative juror analysis to review the trial court's finding on this issue. Assuming without deciding that a comparative juror analysis should be conducted under the circumstances presented to evaluate the plausibility of the prosecutor's *volunteered* explanation as to R.M., we conclude defendant's proffered analysis fails to establish purposeful discrimination. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 270 [33 Cal. Rptr. 3d 397, 118 P.3d 451] [comparative juror analysis failed to demonstrate purposeful discrimination].)

Defendant asserts that R.M.'s belief that voluntary intoxication should or could be a defense to a crime or make an offender less culpable was shared

by non-Hispanic Jurors K.D., A.B., and K.Z., whom the prosecutor did not peremptorily challenge. His assertion is misleading because R.M. indicated "yes" on his questionnaire that voluntary intoxication "should automatically" be a defense to a crime or reduce an offender's culpability "because your mind is not where it['s] suppose[d] to be." None of the jurors with whom defendant compares R.M. marked "yes" to this question or otherwise shared his view. Accordingly, a comparison of the responses to the voluntary intoxication question by these prospective jurors does not alter our conclusion that the record substantiates the trial court's implied finding that the prosecutor's reason for excusing R.M. was genuine and nondiscriminatory.

Finally, defendant also compared Prospective Juror L.B., who regarded herself as a leader, with non-African-American jurors who also considered themselves leaders. He does not, however, expressly ask that we perform a comparative analysis, as he did with Prospective Juror R.M. Performing a comparative analysis is problematic when, as here, the prosecutor did not provide reasons for the challenge because the trial court found no prima facie case had been established. Indeed, in *Miller-El*, the high court used comparative analysis to review the trial court's findings as to the plausibility of the prosecutor's reasons. (See *Miller-El*, *supra*, 545 U.S. at pp. 241–253 [125 S.Ct. at pp. 2325–2332].) In any event, the record does not convince us that the court should have found a prima facie case at this stage.

In sum, challenging these two prospective jurors early in the process did not, itself, support an inference that discrimination had occurred. Accordingly, we conclude defendant failed to make a prima facie case of discrimination at this stage.

> b. *Asserted Trial Court Error in Accepting the Prosecutor's Reasons for Challenging Prospective Hispanic and African-American Jurors*

Although the court initially found no prima facie showing as to either the first Hispanic or African-American challenged, it later found, at least impliedly, that defendant had made such a showing as to both groups and asked the prosecutor to justify his challenges to two prospective jurors of each group. Defendant contends the trial court erred by accepting the prosecutor's reasons for challenging these prospective jurors and ultimately finding he did not establish purposeful discrimination. We disagree.

A trial court's ruling on this issue is reviewed for substantial evidence. (*People v. McDermott*, *supra*, 28 Cal.4th at p. 971.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from

sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

In this case, based on our review of the record, we conclude substantial evidence supports the following findings of the trial court that the prosecutor's peremptory challenges were based on genuine nondiscriminatory reasons and not group bias. (*People v. McDermott, supra,* 28 Cal.4th at p. 970.)

The prosecutor stated numerous grounds for challenging Prospective Juror E.A., who was Hispanic. This juror had a sister who was in prison for second degree murder and three counts of armed robbery. The prosecutor believed E.A. likely would be offended by his argument that defendant is a "monstrous person" and should be put to death, because her sister is a convicted murderer. The prosecutor also was concerned that this juror worked for the City of Santa Monica as a park ranger but had applied to the Santa Monica Police Department and failed a written test. Because E.A. was not hired as a police officer, the prosecutor had the same concern that he would regarding a prospective juror who was a former police officer. He believed she would be overly critical of the police investigation that was conducted in this case and have difficulty evaluating the evidence objectively. Also, this juror previously served on a jury that resulted in a hung jury. The trial court accepted the prosecutor's reasons, noting that it could not fault him for "being uncomfortable with respect to all of the matters that he has raised."

The prosecutor stated he excused Prospective Juror O.B., another Hispanic, because he was a traveling actor who was presently unemployed, believed minorities are treated unfairly in the criminal justice system, and had strong opinions against the death penalty. When asked to state his general feelings about the death penalty on his questionnaire, O.B. responded, "Don't like the thought of death." He also stated that even though convicted criminals of "gruesome crimes" should be "punished harshly," he believed "death should be an act of nature or fate." The trial court stated it was satisfied that the prosecutor's reason for excusing O.B. was not because of his race.

The prosecutor stated he believed Prospective Juror B.B., an African-American, was biased against the death penalty. B.B. stated that although the death penalty was appropriate in some cases, she felt "life is a precious gift" and the death penalty should be used "very carefully." In addition, this juror witnessed a murder at the age of 12 and learned that "everyone's life is important." The prosecutor further explained that the composition of the jury had changed after defense counsel exercised his last two peremptory challenges. He believed there were more potential jurors in the audience who

would be favorable to the prosecution than there were in the jury box at that time. The trial court acknowledged the prosecutor twice accepted the jury as constituted when it included Prospective Juror B.B. and stated it was convinced the prosecutor's reasons for excusing B.B. were not based on race.

While selecting alternate jurors, the prosecutor challenged H.W., an African-American. He said he did so based on his belief that she was biased against the death penalty. In her questionnaire, H.W. stated she was against the death penalty but that her feelings could change if the victim were "someone close" or a child. She believed a sentence of life without possibility of parole was "worse" than a death sentence. Also, the religious denomination to which H.W. belonged did not support the death penalty. The trial court accepted these race-neutral explanations for challenging H.W. and further observed the prosecutor was legitimately attempting to reduce the number of alternate jurors who had strong opinions against the death penalty.

For the first time on appeal, defendant requests that we perform a comparative juror analysis to evaluate the genuineness of the prosecutor's reasons for peremptorily challenging the prospective jurors in question. Our long-standing practice has been that a reviewing court must consider evidence of comparative juror analysis when a defendant has presented such evidence at the trial court but need not conduct such an analysis for the first time on appeal. (*People v. Johnson, supra,* 30 Cal.4th at pp. 1324–1325 [review of trial court's finding regarding whether defendant established a prima facie showing of group bias];[9] *People v. Johnson* (1989) 47 Cal.3d 1194, 1220–1222 [255 Cal.Rptr. 569, 767 P.2d 1047] [review of trial court's finding regarding the genuineness of a prosecutor's race-neutral reasons for exercising a peremptory challenge].) The high court recently conducted such a comparative juror analysis in *Miller-El, supra,* 545 U.S. at pp. 241–253 [125 S.Ct. at pp. 2325–2332], to evaluate the state trial court's findings as to the plausibility of the prosecutor's explanations for excusing 10 of 11 African-American prospective jurors and ultimately concluded the trial court's findings were erroneous. (*Id.* at pp. 241–263 [125 S.Ct. at pp. 2325–2338].) In this case, assuming without deciding that we should perform the requested comparative juror analysis under the circumstances presented, we conclude that defendant fails to demonstrate purposeful discrimination and that substantial evidence supports the trial court's findings that the prosecutor's race-neutral reasons for excusing Prospective Jurors E.A., O.B., B.B., and H.W. were genuine. (See *People v. Schmeck, supra,* 37 Cal.4th at p. 270.)

---

[9] The original petition for writ of certiorari from our opinion in *People v. Johnson, supra,* 30 Cal.4th 1302, challenged both our holding regarding the standard for a prima facie case and our refusal to conduct comparative juror analysis for the first time on appeal. The high court granted certiorari only on the issue regarding a prima facie case. Accordingly, although it reversed our opinion in *Johnson* regarding the standard for a prima facie case (see *ante,* at p. 1100), it left this part of the opinion intact. (*Johnson, supra,* 545 U.S. at pp. 169–173 [125 S.Ct. at pp. 2417–2419].)

As to E.A., defendant argues that the prosecutor's concern that her sister was convicted of second degree murder and armed robbery applied to other White jurors who had close relatives who had been charged with various crimes. The other crimes, however, were much less serious than murder. Additionally, the prosecutor worried that if he referred to defendant as a monster who deserved to die for killing the victim, he might offend E.A. because of her sister's murder conviction. The other prospective jurors probably would not take offense at such an argument. Moreover, unlike E.A.'s sister, none of the relatives had expressed the belief that he or she was treated unfairly by the justice system, nor did the jurors. As to the prosecutor's concern that E.A. had failed to pass the test for employment with the Santa Monica Police Department and now works as a park ranger, defendant points out that Juror M.L. investigated occupational safety and fire accidents, had taken administrative law courses, and worked for the Veterans Affairs Police Department. M.L., however, is not a former police officer and did not perform criminal investigations. Contrary to defendant's claim, he worked with, not for, the Veterans Affairs Police Department in his capacity as an occupational safety and health specialist. The prosecutor would not likely be as concerned with M.L.'s second-guessing or being overly critical of the investigation in this case as he would with E.A., given she was actually denied employment as a police officer, a position to which she aspired. The other jurors whom defendant identifies are not similarly situated in this respect. Finally, defendant emphasizes that E.A. showed more support for the death penalty than non-Hispanic jurors. While it may be true that E.A. had certain strong views that showed more support for the death penalty than certain non-Hispanic jurors, the prosecutor stated he had "too many" reasons to be concerned about this prospective juror. He was not required to accept E.A. as a juror "if reasons apart from group bias supported his challenge." (*People v. Cornwell, supra,* 37 Cal.4th at p. 72.) Defendant, further, does not point to any other non-Hispanic juror who had similar experiences in each area with which the prosecutor was concerned. In view of the totality of the evidence, we conclude substantial evidence supports the trial court's finding that the prosecutor's reasons were genuine.

With regard to Hispanic Prospective Juror O.B., defendant claims that O.B.'s perception about racial groups did not distinguish him from other jurors or warrant a challenge by the prosecutor. O.B. stated "most minori[ties] are viewed as different by mainstream American" and "therefore [are] not usually given equal merit [*sic*]" in the justice system. None of the jurors defendant identifies share O.B.'s view that "most" minorities are not treated equally in our system of justice. African-American Alternate Juror L.S., however, did share O.B.'s opinion that police officers "often make mistakes" when testifying; others cited by defendant did not. Contrary to his assertion, O.B.'s views on what should be done about the crime problem in Los

Angeles County were somewhat different when compared with the non-Hispanic jurors who were more "pro-police." As the prosecutor remarked, O.B. was "not pro-police." Regarding his view on the death penalty, O.B. did "strongly disagree" with the statement that anyone who intentionally kills another should never receive the death penalty, whereas other jurors did not hold such a strong view. Nonetheless, the prosecutor was concerned with O.B.'s apparent strong opposition to the death penalty, as shown by his statement that "even though convicted criminal[s] of · gru[esome] crimes should be punished harshly, death should be an act of nature or fate." Although defendant has shown some similarities between O.B. and non-Hispanic jurors and alternate jurors, none of these individuals were similar to O.B. in all the areas in which the prosecutor expressed concern. In sum, the record supports the trial court's findings that the prosecutor's stated reasons for challenging O.B. were genuine and race neutral.

With respect to Prospective Juror B.B., an African-American woman, defendant does establish this juror supported the death penalty as much as some jurors. Still, the prosecutor—who had twice accepted the jury as constituted before excusing B.B.—expressed concern that B.B. had witnessed a murder as a young child and learned that life is "precious." He believed she leaned toward life and felt that prospective jurors with stronger views in favor of the death penalty remained in the venire. The prosecutor also stated if this were a White juror under the same exact circumstances, he would challenge the juror for the same tactical reason. Defendant fails to establish the existence of a juror who was similarly situated. Finally, " '[w]hile the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection.' " (*People v. Ward* (2005) 36 Cal.4th 186, 203 [30 Cal.Rptr.3d 464, 114 P.3d 717], quoting *People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Two African-American women remained on the final jury. Under the totality of the circumstances, the record supports the trial court's findings that the prosecutor's challenge as to Prospective Juror B.B. was not race-based or otherwise implausible.

As for H.W., an African-American woman, defendant argues a comparative analysis reveals the prosecutor's statement that he excused her because her religious denomination did not believe in the death penalty was pretextual. Not so. As discussed *ante*, the prosecutor stated he excused H.W. because he believed she was "pro-life." H.W. stated she was against the death penalty but could change her mind if the victim was "someone close." As the prosecutor noted, H.W. was not "close" to Powell. Also, H.W. indicated in her questionnaire that her religious denomination did not believe in the death penalty. During voir dire, the trial court pointed out that in response to the question

whether she felt obligated to accept the position of her religious denomination, H.W. responded "yes" and "no" and then marked out "yes" and wrote "no, I make my own choices." Ultimately, H.W. stated she could make her own decision about imposing the death penalty based on the circumstances. Defendant claims that the prosecutor "improperly assumed that an African-American juror would be more led by their religion than White jurors who were members of churches opposed to the death penalty." The prosecutor did not express such a view. The prosecutor merely mentioned H.W.'s religious denomination did not support the death penalty, suggesting he did not find her credible. Such a finding was reasonable under the circumstances. Also, neither of the jurors identified by defendant equivocated on the issue of the death penalty as did H.W. on her questionnaire and during voir dire. Further, even though she indicated life without parole was the worst punishment, defendant argues that H.W.'s views on the death penalty "did not go beyond" other jurors who sat on the jury. Not true. Although some jurors also may have believed that the punishment of life without parole was worse than the penalty of death, as stated, none expressed reservations about the death penalty as did H.W. In sum, defendant's comparisons fail to establish that the prosecutor's race-neutral reasons were pretextual. Substantial evidence supports the trial court's findings that the prosecutor's reasons were genuine and not based on race.

### B. *Issues Affecting Guilt and Penalty*

#### 1. *Judicial Bias*

Defendant contends the superior court judge assigned to preside over his case for all purposes improperly failed to recuse himself as suggested by defendant and under circumstances in which a reasonable person would have entertained doubts concerning his impartiality, in violation of Code of Civil Procedure section 170.1, subdivision (a)(6). He adds that subsequent rulings made by the judge revealed his bias throughout trial.

#### 2. *Trial Proceedings*

During pretrial proceedings, defendant filed a petition for writ of mandate in the Court of Appeal after the trial judge allegedly "refused to reconsider the denial of [his] section 995 motion [to dismiss the information]." He also requested a temporary stay of the trial proceedings. The Court of Appeal issued the stay on Friday, July 9, 1993. Three hundred prospective jurors had been summoned to appear in the trial court on Monday, July 12, 1993, for the commencement of jury selection. Instead, the trial judge conducted a hearing regarding defendant's writ petition and the temporary stay of proceedings that had issued.

At the hearing, the trial judge said that he was "very upset" about the recent developments in defendant's case because to his knowledge, a copy of defendant's writ petition had not been served on the trial court, and defense counsel gave him no indication of the possibility that a stay of proceedings might issue. The judge further explained that he tried to keep the costs of county trials to a minimum and that he had no time to tell jurors to not report for jury duty as scheduled.

The trial judge and counsel then discussed the procedural posture leading to the filing of the writ petition. Counsel reminded the trial judge that a previous writ petition had been filed in this case. The trial judge remarked that the prior petition was "[a]lso full of specious statements." When counsel disagreed with the judge's characterization, the judge responded, "[Counsel], you are so intellectually dishonest that if you turned around fast, you'd screw yourself into the ground."

The trial judge and counsel then debated the merits of the writ petition and the circumstances that resulted in its filing. Counsel claimed that the trial judge failed to rule on his motion to reconsider the denial of his section 995 motion. The trial judge disagreed and stated that he declined to reconsider the motion on "June 21st," and that "Oh, I see. The word 'refused' doesn't mean refused to you." The judge then asked counsel, "How many times do you want me to reconsider a denial to reconsider?"

After a recess, the trial judge told counsel that he had considered whether this incident would cause him to be biased against defendant and ultimately decided he could give defendant a fair trial. Counsel asked the trial judge whether he would not hold the temporary stay of the trial proceedings against defendant. The trial court responded, "Without question."

The trial judge continued to complain that counsel's office had not served him with the writ petition and that certain allegations were either untrue or misleading. Ultimately, the trial judge reiterated he could give defendant a fair trial and assured counsel he would disqualify himself if he found himself "compromising" defendant's right to a fair jury trial. Trial counsel did not respond and apparently accepted the trial judge's representation that defendant would receive a fair trial.

We note initially that during the pretrial hearing regarding the issuance of the temporary stay of proceedings that defendant did not request but merely suggested the trial judge "should recuse [himself]." When the trial judge responded by assuring counsel that defendant would receive a fair trial and continuing with the proceedings, counsel made no effort to comply with the procedures under Code of Civil Procedure section 170.3, subdivision (c)(1),

and seek disqualification of the judge. (*People v. Bryant* (1987) 190 Cal.App.3d 1569, 1572–1573 [236 Cal.Rptr. 96] [discussing the procedures under Code of Civil Procedure section 170.3, subdivision (c)(1), that counsel is to follow to challenge a judge's qualification to preside over further proceedings once the judge refuses to disqualify himself or herself].) As the People assert, counsel apparently accepted the judge's representation that defendant would receive a fair trial.

■ "If a judge refuses or fails to disqualify herself, a party may seek the judge's disqualification. The party must do so, however, 'at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification.' (Code Civ. Proc., § 170.3, subd. (c)(1).)" (*People v. Scott* (1997) 15 Cal.4th 1188, 1207 [65 Cal.Rptr.2d 240, 939 P.2d 354].) As was the case in *Scott*, defense counsel was fully aware before and during trial of all the facts defendant now cites in support of his claim of judicial bias. But he never claimed during trial that the judge should recuse himself or that his constitutional rights were violated because of judicial bias. "It is too late to raise the issue for the first time on appeal." (*Ibid.*; see also *People v. Brown* (1993) 6 Cal.4th 322, 334 [24 Cal.Rptr.2d 710, 862 P.2d 710] ["[Code of Civil Procedure s]ection 170.3[, subdivision] (d) forecloses appeal of a claim that a statutory motion for disqualification authorized by section 170.1 was erroneously denied"].) For the same reason, defendant has forfeited his additional claims that the trial judge's alleged bias affected his subsequent trial rulings. (*Scott, supra,* 15 Cal.4th at p. 1207.)

In any event, defendant's claim lacks merit.

Defendant has a due process right to an impartial trial judge under the state and federal Constitutions. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309 [113 L.Ed.2d 302, 111 S.Ct. 1246]; *People v. Brown, supra,* 6 Cal.4th at p. 332.) The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. (*Bracy v. Gramley* (1997) 520 U.S. 899, 904–905 [138 L.Ed.2d 97, 117 S.Ct. 1793].)

Section 1044 provides that a trial court has the duty to control the trial proceedings. (See also *People v. Carpenter* (1997) 15 Cal.4th 312, 397 [63 Cal.Rptr.2d 1, 935 P.2d 708].) When an attorney engages in improper behavior, such as ignoring the court's instructions or asking inappropriate questions, it is within a trial court's discretion to reprimand the attorney, even harshly, as the circumstances require. (*People v. Snow* (2003) 30 Cal.4th 43, 78 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Mere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias. (*Moulton Niguel Water Dist. v. Colombo*

(2003) 111 Cal.App.4th 1210, 1219–1220 [4 Cal.Rptr.3d 519]; see also *People v. Farnam, supra,* 28 Cal.4th at pp. 193–195.) Moreover, a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review. (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 795–796 [171 Cal.Rptr. 590, 623 P.2d 151]; *McEwen v. Occidental Life Ins. Co.* (1916) 172 Cal. 6, 11 [155 P. 86].)

On appeal, we assess whether any judicial misconduct or bias was so prejudicial that it deprived defendant of " 'a fair, as opposed to a perfect, trial.' " (*People v. Snow, supra,* 30 Cal.4th at p. 78, quoting *United States v. Pisani* (2d Cir. 1985) 773 F.2d 397, 402.)

Here, based on our review of the record, we conclude defendant fails to establish he was deprived of his constitutional right to a fair and impartial tribunal. The trial judge was outraged because trial counsel failed to give him or the courtroom clerk a courtesy call and inform him that he (counsel) had requested a temporary stay of proceedings that would potentially obviate the need for the 300 prospective jurors who had been summoned for the commencement of jury selection. But all of his comments in this regard were made outside the presence of any jurors. The judge made clear, moreover, that his irritation was with counsel and not defendant. He unequivocally stated defendant would receive a fair trial, and counsel accepted that representation. Further, the trial judge did not display overt bias against the defense so as to deprive defendant of a fair trial. (*People v. Snow, supra,* 30 Cal.4th at p. 79.)

Defendant's additional claim that subsequent rulings by the trial judge revealed a bias that "was more than passing anger" also fails on the merits. As stated, adverse or erroneous rulings, especially those that are subject to review, do not establish a charge of judicial bias. (*Andrews v. Agricultural Labor Relations Bd., supra,* 28 Cal.3d at pp. 795–796.) Defendant never expressed any concern that the judge was prejudiced against him during trial nor did he request the judge to recuse himself. We see nothing in the record establishing bias against defendant. As the People argue, defendant's willingness to let the entire trial pass without another charge of bias against the judge not only forfeits his claims on appeal but also strongly suggests they are without merit. (See, e.g., *People v. Tappan* (1968) 266 Cal.App.2d 812, 816–817 [72 Cal.Rptr. 585] [following the trial judge's allegedly prejudicial pretrial comment, defendant's failure to complain of judge's bias during trial showed defendant's confidence in judge's impartiality].)

Accordingly, defendant's claim of judicial bias fails on the merits.

C. *Guilt Phase Issues*

1. *Evidentiary Issues*

a. *Admissibility of Powell's Statements Regarding Her Fear of Defendant*

During the prosecutor's direct examination of Braziel, defense counsel objected to Braziel's testimony that "[Powell] said 'Francisco was in my house when I was asleep and my door was open.' " Outside the presence of the jury, counsel argued Powell's state of mind was irrelevant, the statements were inadmissible hearsay, and Powell, of course, was unavailable for cross-examination.

The trial court denied defendant's objections, ruling the statements were relevant and admissible under the state-of-mind exception to the hearsay rule to explain Powell's subsequent conduct of jerking away from defendant when he approached her in her car. (Evid. Code, § 1250.) The trial court admonished the jury that Powell's statements could not be considered to prove defendant was in fact in Powell's house as she slept, but were admitted only for the purpose of explaining her subsequent actions, if relevant.

On appeal, defendant contends the trial court erred in admitting Powell's statements that she was afraid of him and believed he was in her house while she napped on the day of the murder. He claims such evidence was irrelevant, inadmissible hearsay, and more prejudicial than probative under Evidence Code section 352. We find no error.

The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence. (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].) This standard is particularly appropriate when, as here, the trial court's determination of admissibility involved questions of relevance, the state-of-mind exception to the hearsay rule, and undue prejudice. (*Ibid.*) Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

(8) Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.) ■ " 'Hearsay evidence,' " defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is generally inadmissible. (Evid. Code, § 1200.)

Evidence of a statement of a declarant's state of mind, when offered to prove or explain the declarant's conduct, is admissible, as long as the statement was made under circumstances indicating its trustworthiness. (Evid. Code, §§ 1250, subd. (a)(2), 1252.) A prerequisite to this exception is that the victim's mental state or conduct be placed in issue. (*People v. Noguera* (1992) 4 Cal.4th 599, 621 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Evidence of the murder victim's fear of the defendant is admissible when the victim's state of mind is relevant to an element of an offense. (See, e.g., *People v. Waidla, supra,* 22 Cal.4th at p. 723 [victim's statements indicating fear of defendants were relevant to prove lack of consent in the burglary and robbery related to her murder].)

■ Here, the trial court properly admitted Braziel's testimony. "In a prosecution for forcible rape, evidence is relevant if it establishes any circumstance making the victim's consent to sexual intercourse less plausible." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123–1124 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Powell's statements that she believed defendant came into her house as she napped and that she was afraid of him were clearly probative of her lack of consent to sexual intercourse in the attempted rape. Therefore, Powell's state of mind was relevant to prove the attempted-rape felony murder and the attempted-rape special-circumstance allegation, and thus fell within the state-of-mind exception. (Evid. Code, § 1250, subd. (a)(2).)

Defendant argues that even if Powell's state of mind was at issue, the statements were unreliable. To the extent the incident Powell described was a dream or hallucination, for example, he argues it would not be trustworthy to explain her state of mind. But the court admonished the jury the statements were not to be considered as proof defendant was actually in Powell's house when she awakened from her nap, but as circumstantial evidence of her belief that he was there. In addition, although the court recognized Powell might have dreamed defendant was in her house or she may have spoken falsely about the incident, such a possibility, without more, is insufficient to render her statements unreliable. (See *People v. Rowland, supra,* 4 Cal.4th at p. 264.)

■ Defendant also contends the trial court abused its discretion in ruling that Powell's extrajudicial statements were not substantially more prejudicial than probative. We conclude the claim fails. Evidence is substantially more prejudicial than probative under Evidence Code section 352 if it poses an intolerable " 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla, supra,* 22 Cal.4th at p. 724, quoting *People v. Alvarez, supra,* 14 Cal.4th at p. 204, fn. 14.) As stated, Powell's statements indicating her fear of defendant were relevant to prove the lack of consent in the attempted-rape felony murder and attempted-rape special circumstance. That Powell believed defendant entered her house as she napped was not

inflammatory, as defendant contends, given other witnesses had testified defendant had been in Powell's house throughout the day.

Further, the court specifically admonished the jurors not to consider Powell's statements as proof defendant entered her house. We presume jurors follow limiting instructions (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120 [240 Cal.Rptr. 585, 742 P.2d 1306]), and defendant has not rebutted that presumption. Defendant contends, however, that these statements would have prejudicially impacted the jury in the penalty phase because the court instructed it to consider the evidence admitted at the guilt phase. In doing so, defendant argues, it would have assumed the truth of the statements. But with respect to evidence that was admitted for a limited purpose in the guilt phase, the court reminded the jury in the penalty phase it could consider the evidence only for that limited purpose.

> b. *Admissibility of Powell's Statements Regarding Other Workers*

On the day of the murder, Braziel twice informed Al Canale, the electrical contractor, that "Hispanic workers," including defendant, were bothering Powell in her house. Semere, one of Powell's coworkers, talked to Powell on the telephone on the day of the murder and testified he heard in the background the voices of two men as they apparently entered Powell's house through her sliding glass door.

On cross-examination by defense counsel, Braziel recalled only the first names of five members of the construction crew: Antonio, Roberto, Francisco (defendant), Ruijilio, and Omar. He testified he had observed Roberto, Antonio, and defendant in Powell's backyard. When counsel attempted to ask Braziel whether Powell had complained about Roberto being in her house, the trial court sustained the prosecutor's hearsay objection. Thereafter, Braziel testified that he had observed Roberto go to Powell's back door and that Powell complained Roberto and other construction workers were bothering her, knocking on her door two or three times a day.

Defendant contends the trial court abused its discretion when it sustained the prosecutor's hearsay objection and prevented trial counsel from asking Braziel whether Powell complained about Roberto being in her house. We conclude the trial court properly limited counsel's cross-examination of Braziel.

Defendant argues evidence of Powell's state of mind with respect to Roberto was relevant and admissible under Evidence Code section 1250 to explain her frustration with the workers and establish defendant was not the

sole source of her frustration. But, as stated, the declarant's mental state or conduct must be at issue to qualify for admission under the state-of-mind exception to the hearsay rule. (*People v. Noguera, supra*, 4 Cal.4th at p. 621.) Here, there was no evidence of third party culpability or evidence that Powell feared Roberto. Powell's state of mind as to Roberto thus was not relevant to prove an element of an offense or to show Powell acted in conformity with that state of mind. (Evid. Code, § 1250.) Therefore, evidence that Powell may have been frustrated with Roberto or the other workers was irrelevant and inadmissible. We conclude the trial court did not abuse its discretion in limiting counsel's inquiry on this point.

Even assuming the trial court abused its discretion by limiting counsel's cross-examination of Braziel, any error was harmless because it is not reasonably probable the evidence would have affected the outcome. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People v. Cudjo* (1993) 6 Cal.4th 585, 611–612 [25 Cal.Rptr.2d 390, 863 P.2d 635] [erroneous exclusion of evidence of third party culpability]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The jury heard testimony that in addition to defendant, other workers had been in Powell's house. Semere testified he heard Powell holler for "Jose" and another man to get out of her house as he spoke with her on the telephone in the afternoon on the day of the murder. Further, Braziel testified Powell complained that Roberto and other workers knocked on her door two or three times a day. Indeed, for these reasons, we would find any error harmless beyond a reasonable doubt.

> c. *Admissibility of Hector Tobar's Testimony Regarding Powell's Love of Guatemalan People and the Spanish Language*

Defendant contends the trial court abused its discretion by admitting Hector Tobar's testimony regarding Powell's interest in Guatemala and its people, culture, and language. Tobar testified he and Powell took a 10-day trip to Guatemala in 1988. Powell became "very fond" of Guatemala and wanted to stay there "because she loved the people so much." She began to learn the Spanish language and would practice whenever she could find someone to speak with her. On one occasion, Tobar visited Powell in the hospital where she worked and saw her talk "to people in Spanish in the cafeteria and other places. She—she loved to be able to talk to people." At a bench conference, the trial court denied counsel's motion to strike Tobar's testimony on the ground it was irrelevant.

Defendant contends the evidence was irrelevant. We disagree. As stated, relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the

action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Scheid* (1997) 16 Cal.4th 1, 13 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

Defendant and several of the construction workers whom Powell fed on occasion and who knocked on Powell's door several times a day were Spanish speaking. Braziel heard Powell speak Spanish on the day of the murder. Evidence that Powell enjoyed practicing her Spanish language skills by talking with Spanish-speaking people had a tendency to explain why she took an interest in the construction workers next door, including defendant, and shared her food and drink with them. Thus, the evidence was relevant to establish the nature of the relationship between Powell and the workers—that is, a nonsexual relationship consistent with the prosecution's theory that Powell's interest in the workers, including defendant, was other than sexual and that she feared defendant's unwanted attention. In light of its relevance under this theory, the trial court did not abuse its discretion in admitting the evidence. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1173 [113 Cal.Rptr.2d 827, 34 P.3d 937].)

On appeal, defendant also argues that evidence of Powell's love for Guatemala and its people and her enjoyment in speaking Spanish with others was inadmissible under Evidence Code section 1101[10] to show Powell was friendly with defendant simply because he was Guatemalan and spoke Spanish. He further argues this evidence was not properly admitted under Evidence Code section 1103[11] because he had not introduced evidence showing Powell's dislike of Guatemala, its people, or its language. Counsel's objection to this testimony on the sole ground of relevance, however, did not preserve for appeal his present contention that the testimony was improper character evidence. (Evid. Code, § 353; *People v. Clark* (1992) 3 Cal.4th 41, 127–128 [10 Cal.Rptr.2d 554, 833 P.2d 561].) His claim is thus forfeited on this ground. In any event, this claim is without merit.

Evidence may be relevant and admissible for one purpose even though it is inadmissible for another purpose. (See Evid. Code, § 355; *People v. Eagles* (1982) 133 Cal.App.3d 330, 340 [183 Cal.Rptr. 784].) Tobar's testimony relating Powell's love for Guatemala, its people, and its language was

---

[10] Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[11] The prosecution may introduce character evidence of the victim only to rebut evidence offered by the defendant to prove the victim acted in conformity with a particular character trait. (Evid. Code, § 1103, subd. (a)(2).)

admissible to explain Powell's motive in interacting with the construction workers, including defendant, on the day of the murder. Further, we disagree with defendant's assertion that Tobar's testimony created a uniquely sympathetic view of the victim in the guilt phase. (See former CALJIC No. 1.00 [the jury must not be influenced by sympathy]; *People v. Fields* (1983) 35 Cal.3d 329, 362 [197 Cal.Rptr. 803, 673 P.2d 680] ["appeals to the sympathy or passions of the jury are inappropriate at the guilt phase"].) A court need not exclude otherwise admissible evidence merely because it might generate sympathy for a crime victim.

### d. *Admissibility of Dr. Jose La Calle's Testimony That Defendant Was Passive*

Defendant contends the trial court erroneously excluded the testimony of Dr. Jose La Calle, who would have testified regarding defendant's passive personality. Specifically, at an Evidence Code section 402 hearing, trial counsel sought to present Dr. La Calle's expert testimony that defendant was incapable of committing a violent act under normal circumstances. Counsel offered to prove that Dr. La Calle would testify that based on an interview of defendant and results from a series of tests given to him, he formed the opinion that defendant has a passive personality, is nonviolent, and is incapable "under normal circumstances" of committing a violent act resulting in a homicide. Counsel further argued that Dr. La Calle's testimony was relevant to bolster character evidence he intended to introduce regarding defendant's reputation for honesty, veracity, and nonviolence. The trial court refused to hear Dr. La Calle's testimony and stated the evidence would be admissible only if he was "100 percent certain" that defendant would not commit a violent act under *any* circumstances.

A defendant may introduce opinion evidence of his or her character to show a nondisposition to commit an offense. (Evid. Code, § 1102, subd. (a); *People v. Stoll* (1989) 49 Cal.3d 1136, 1153 [265 Cal.Rptr. 111, 783 P.2d 698] [defendant charged with sex offense may present expert opinion evidence of "lack of deviance"].) All expert opinion testimony, however, is subject to the requirement that it be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) A trial court's decision as to whether a particular subject is a proper one for expert opinion is reviewed for abuse of discretion. (*People v. Mayfield* (1997) 14 Cal.4th 668, 766 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Cole* (1956) 47 Cal.2d 99, 103–105 [301 P.2d 854]; *People v. Manriquez* (1999) 72 Cal.App.4th 1486, 1492 [86 Cal.Rptr.2d 69].)

We conclude that the trial court applied an incorrect standard by requiring Dr. La Calle to be "100 percent certain" that defendant would not commit a

violent act under any circumstances before the proffered testimony could be admitted. Given an opportunity, the expert might have testified (or counsel might have expanded the offer of proof to state) that the facts of this case fell within his definition of normal circumstances. Any error in excluding Dr. La Calle's proposed testimony, however, was nonprejudicial. The evidence of guilt was strong, and the proposed testimony would have opened the door for rebuttal with the evidence of defendant's prior assault in Guatemala on Angela Guerra de Maderos, which the prosecution introduced at the penalty phase.

Finally, defendant claims the trial court's erroneous ruling also violated his right to due process, to present a defense, and to a reliable verdict. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) These constitutional claims lack merit because, for the reasons stated, the exclusion of this evidence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

e. *Admissibility of Rebuttal Evidence Used in Re-creation of Crime Scene*

Defendant contends the trial court improperly admitted in rebuttal a hamper that was used in the prosecution's re-creation of the crime scene without establishing that it met foundational requirements. He testified in his own defense that after he found Powell on her utility room floor, he wedged himself between the water cooler and the hamper and tried to lift her by her shoulders. Defendant put Powell back on the floor when he realized she was too injured to move. In doing so, he propped himself up on something, although he could not remember if it was the wall, trash can, or hamper.

During rebuttal, the prosecution introduced a series of exhibits, including a substitute hamper (the original had not been collected as evidence), that reconstructed the crime scene in a courtroom mockup. The courtroom mockup was also transported to the crime scene for a jury view. Detective Wachter testified that a wastebasket collected from the crime scene had a price sticker from an Armstrong store. Assuming the hamper was also purchased at an Armstrong store, Wachter purchased a substitute hamper that was "identical in appearance" to the hamper lying next to the victim's body at the time of the murder. Defense counsel objected to admission of the hamper on the grounds that there was no showing the substitute hamper was made of the same material and had the same strength and flexibility as the original hamper, and its admission therefore, was improper.

The trial court overruled counsel's objection and admitted the substitute hamper, finding the hamper was of a size similar to the one depicted in the

crime scene photographs. It also noted the jury understood the original hamper was not available. On appeal, defendant renews his challenge to the hamper's admissibility,

 When, as here, the relevance of evidence depends on the existence of a preliminary fact, the proffered evidence is inadmissible unless the trial court finds there is sufficient evidence to sustain a finding of the existence of the preliminary fact. (Evid. Code, § 403, subd. (a)(1).) That is, the trial court must determine whether the evidence is sufficient for a trier of fact to reasonably find the existence of the preliminary fact by a preponderance of the evidence. (*People v. Marshall* (1996) 13 Cal.4th 799, 832 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 466 [48 Cal.Rptr.2d 525, 907 P.2d 373].) A trial court's decision as to whether the foundational evidence is sufficient is reviewed for abuse of discretion. (*Ibid.*)

The trial court did not abuse its discretion. Defendant argues the prosecution failed to establish the preliminary fact that the substitute hamper was similarly designed and constructed as the one next to the victim's body at the time of the murder. But the flaw in this argument is that because the original hamper was not recovered from the crime scene, its design and construction could not be established at trial. Contrary to defendant's assertions, the prosecutor did not invite the jury to conduct a physical experiment on the substitute hamper in order to test its strength or construction. The prosecutor properly encouraged the jury to test defendant's testimony by using the substitute hamper and other objects of the mockup to determine whether defendant could have stood between the water cooler and hamper, adjacent to Powell's knee, when he purportedly lifted her up by her shoulders. (*People v. Baldine* (2001) 94 Cal.App.4th 773, 778 [114 Cal.Rptr.2d 570] [jurors may use an exhibit according to its nature to aid them in weighing the evidence, but not to generate new evidence].)

There was ample evidence from which the jury could determine the substitute hamper resembled the original hamper under conditions substantially similar to those prevailing at the time of Powell's murder. Detective Wachter testified that the substitute hamper was "identical in appearance" to the original. The forensic artist who created the courtroom mockup used the hexagonal tiles of the utility room floor and the wall as a grid to plot the coordinates of the hamper, water cooler, Powell's body, and other items. He estimated the placement of these items were accurate to one inch. The jury viewed the crime scene and could compare the relative size and locations of the objects in the mockup, including the substitute hamper, to the dimensions of the actual utility room. In addition, the jury could compare the substitute

hamper with the hamper resting next to Powell's body, as depicted in photographs of the crime scene.

### f. *Exclusion of Surrebuttal Evidence Explaining Why Defendant Did Not Tell His Wife About Finding Powell's Body*

Defendant contends that the trial court erred under Evidence Code section 356 by excluding surrebuttal evidence that would have explained why he was afraid to tell his wife he discovered Powell's body.

Defendant testified in his defense that after returning home on the day of the murder, he did not tell his wife he had discovered Powell's body because he believed she would "bawl [him] out or something." The prosecutor also elicited on cross-examination that defendant believed his wife would get mad at him and "bawl [him] out" for trying to help Powell. Defendant did not tell his wife about finding Powell's body until months after he was arrested.

Outside the presence of the jury, defense counsel sought to present surrebuttal evidence explaining why defendant was afraid to tell his wife about finding Powell's body. Counsel made an offer of proof that defendant's wife, Antonia Salguero, would testify she and defendant argued when he helped injured people in the past and that she felt he should not help people. Salguero would testify regarding a specific incident in which defendant was falsely accused of shooting an individual whom he had tried to help. The trial court ruled evidence that defendant and his wife generally argued when defendant helped others was admissible, but evidence regarding the specific incident in Guatemala was inadmissible.

Salguero testified in the defense's case-in-chief that she had scolded defendant "many times" for helping other people. In the prosecution's rebuttal, she testified, "I never liked for him to be defending other people or anything. And it was his habit all the time." On cross-examination by defense counsel, Salguero further testified she "got very angry" with defendant because he had gone into Powell's house and tried to help her.

Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." The purpose of this section is to prevent a party from using select aspects of a conversation, act, declaration, or writing to create a

misleading impression on the subject presented to the jury. (*People v. Arias* (1996) 13 Cal.4th 92, 156 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

In this case, defendant was the proponent of evidence that his wife would scold him for having tried to help Powell. Therefore, he was not an *adverse party* entitled to inquire into the whole subject under Evidence Code section 356. (*People v. Lawley* (2002) 27 Cal.4th 102, 155 [115 Cal.Rptr.2d 614, 38 P.3d 461].) Accordingly, we conclude no error occurred.

g. *Admission of Defendant's Statements to the Bailiff*

At the prosecutor's request, the trial court conducted an Evidence Code section 402 hearing near the end of the prosecution's case-in-chief to determine the admissibility of a statement defendant had made to Deputy Sheriff Richard Breton, a courtroom bailiff, during a pretrial hearing. At the hearing, Breton testified that on June 14, 1993, he had a conversation with defendant as he escorted him from the courtroom to the lockup. Breton told defendant he had visited several cities in Guatemala and enjoyed the country. Defendant acknowledged the cities were very nice and then said, "In my country, I do this, no problem, I go home tonight." A few seconds later, he said something in Spanish that Breton did not understand.

Trial counsel objected to admission of Breton's testimony on the ground that defendant's statement to Breton was ambiguous.[12] The prosecution argued the statement was admissible as an implied admission of guilt. The trial court acknowledged defendant's statement was ambiguous but ruled the testimony was nonetheless admissible because *what* defendant was referring to when he said "I do this" is for the trier of fact to determine. At trial, Breton's testimony was consistent with his testimony at the hearing.

 On appeal, defendant maintains the statement should have been excluded because the meaning of "I do this" was ambiguous. His claim fails, however, because it "concerns only the weight of this evidence, not its admissibility, which does not require complete unambiguity." (*People v. Ochoa* (2001) 26 Cal.4th 398, 438 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

Defendant additionally argues the statement was hearsay and not admissible as an implied admission under Evidence Code section 1220. Because defendant did not object on this ground at trial, he may not raise this issue on appeal. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049 [90 Cal.Rptr.2d

---

[12] Counsel also objected that the prosecution violated the discovery rules because this testimony was not disclosed until the day the prosecution rested its case. Defendant, however, does not raise this contention on appeal. In any event, the trial court found no suggestion the prosecutor was aware of this testimony but consciously withheld it from the defense.

607, 988 P.2d 531].) Moreover, the argument is without merit. Evidence Code section 1220 provides that "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." In this case, the evidence was of a statement made by and offered against defendant, the declarant as well as a party to this prosecution. Regardless of whether the statement can be described as an admission, the hearsay rule does not require its exclusion when it is offered against a party declarant. (*People v. Carpenter, supra,* 21 Cal.4th at p. 1049.)

Finally, relying on *People v. Hill* (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673], and *People v. Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1], defendant argues the trial court had a sua sponte duty to instruct the jury that the bailiff's testimony was not entitled to any special weight simply because it came from a bailiff. In *Hill,* the courtroom bailiff overheard the defendant make incriminating statements and at trial, testified for the prosecution regarding those statements. (*Hill,* at p. 842.) The bailiff thereafter resumed his courtroom duties. (*Ibid.*) On appeal, the defendant argued that, among other things, the trial court, on its own motion, should have instructed the jury to not give the bailiff's testimony any additional weight merely because he was a bailiff. (*Id.* at pp. 842–843.) We agreed such an instruction should have been given, and further concluded the bailiff should have been reassigned to another courtroom after he testified because the jurors would likely have accorded the bailiff's testimony additional weight simply because he was a uniformed officer in charge of their protection. (*Id.* at pp. 842–843, 846.)

In *People v. Cummings, supra,* 4 Cal.4th at page 1289, the courtroom bailiff similarly overheard the defendant make incriminating statements and subsequently testified at trial for the prosecution regarding those statements. The defendant objected to admission of the bailiff's testimony on the grounds its admission would deny him due process and a fair and impartial trial because the bailiff was a trusted court officer, had been involved in seating and escorting the jurors, and had relayed juror messages to the court. (*Ibid.*) On appeal, we agreed with the trial court's findings that the probative value of the testimony outweighed any prejudice to the defendant from his status as a trusted officer and concluded the testimony was properly admitted. (*Id.* at p. 1290.) The bailiff had little direct contact with jurors, had not been identified as a potential witness, was not a key prosecution witness, and was relieved of his courtroom duties upon testifying. (*Ibid.*) In addition, the trial court admonished the jury not to accord the bailiff's testimony greater weight because he had been a bailiff in the courtroom. (*Id.* at p. 1291.)

In this case, Breton served as bailiff in *pretrial* proceedings but was reassigned from the courtroom in which defendant's case was tried *prior to*

*commencement of jury selection.* Hence, there was no official interaction between Breton, acting as the courtroom bailiff, and the jury. Unlike *Hill* and *Cummings,* the danger that the jury would accord Breton's testimony additional weight because of his direct interaction with them was therefore nonexistent. Breton, moreover, was not the key prosecution witness, and his presence as a uniformed officer was no different than that of any other uniformed officer testifying in court. Accordingly, on these facts, we conclude the trial court was not required to admonish the jury that no greater weight should be accorded Breton's testimony because he was a courtroom bailiff.

### 2. *Alleged Prosecutorial Misconduct*

■ Defendant contends the prosecutor engaged in prejudicial misconduct by repeatedly asking argumentative and sarcastic questions during cross-examination of defendant. Prosecutorial misconduct is reversible under the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under [California] law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales, supra,* 25 Cal.4th at p. 44.)

Generally, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3].) At trial, defendant objected to the prosecutor's cross-examination of defendant on several occasions. We conclude either no misconduct occurred or any misconduct was harmless.

### a. *Questions About Defendant's Truthfulness*

During his first interview with the police, defendant denied that he had ever been in Powell's house. During the second interview, defendant initially maintained that he had never been in Powell's house but eventually admitted he had previously lied to the police and had entered Powell's house after she was killed. On cross-examination, the prosecutor asked defendant several times whether he "twitched," "blinked," "blushed," or otherwise indicated to the officer who interviewed him that he was lying. Defendant generally responded that he did not know or remember. The trial court overruled counsel's objections that the prosecutor's questions were argumentative.

On appeal, defendant claims the prosecutor's questions constituted misconduct because they were argumentative and served only to inflame the jury. We disagree. An argumentative question is designed to engage a witness in argument rather than elicit facts within the witness's knowledge. (*People v. Mayfield* (1997) 14 Cal.4th 668, 755 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Defendant admitted he had lied to the police during the first interview. As the People point out, the questions were appropriate because they related to distinct mannerisms or gestures defendant may have displayed when he lied. They were, in essence, designed to elicit facts within defendant's knowledge that related to the assessment of his credibility. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103] [it is the exclusive province of the trier of fact " 'to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends' "].) No misconduct occurred.

In addition, defendant claims that the trial court acted improperly in clarifying a question during this examination. Defendant had indicated he did not understand what the prosecutor was asking. The court described the cross-examination as "stalled" and clarified the prosecutor "is asking you if you are aware of anything that you do when you lie, such as blush or blink your eyes or swallow hard or be unable to look the other person in the eye." Defendant responded, "I don't know."

Absent an objection, defendant has forfeited this claim on appeal. Nonetheless, it is without merit. While it is ordinarily the better practice for the trial court to let counsel develop the case, a trial court properly may "undertake the examination of witnesses . . . when it appears that relevant and material testimony will not be elicited by counsel." (*People v. Rigney* (1961) 55 Cal.2d 236, 243 [10 Cal.Rptr. 625, 359 P.2d 23].)

### b. *Other Improper Questions*

Defendant claims the prosecutor improperly asked defendant why two prosecution witnesses would lie. We disagree.

Eric Sloane testified for the prosecution that on the day of Powell's murder, when he looked for defendant on the jobsite, he heard a gate close and saw defendant emerge from a hedge that separated the house being remodeling and Powell's house. Sloane asked defendant why he was on Powell's property. According to Sloane, defendant apologized and told him it would not happen again. Defendant testified he was coming from the garage on the construction site and had not been on Powell's property. On cross-examination, over objection, the prosecutor asked defendant if he knew of any reason why Sloane would have lied. Defendant testified that Sloane was not lying because "[h]e didn't find me on the other side inside the house."

Prosecution witness Susan Michel testified that shortly after 4:00 p.m. on the day of Powell's murder, she walked by Powell's house and observed three workers drive away from the remodeling site. According to Michel, defendant remained and asked her whether she had come from Powell's house. Michel told him no, and that she lived down the street on the corner. On cross-examination, defendant denied that he had such a conversation with Michel. The prosecutor then asked defendant if Michel had any reason to lie about him. Defendant responded no.

The People argue defendant has forfeited this claim as to Michel because he failed to object to the prosecutor's question of her. We disagree. Any objection would have been futile because the trial court had previously overruled his objection on the same ground with respect to witness Sloane. (*People v. Hill, supra,* 17 Cal.4th at p. 821.) Therefore, defendant has not forfeited the claim for appeal. (*Ibid.*)

The prosecutor did not ask defendant for his opinion as to Sloane's and Michel's veracity. Rather, the questions assumed these witnesses might have been lying and sought possible explanations for their false testimony from defendant. This is not misconduct. It is apparent the prosecutor's questions were designed merely to highlight the discrepancies between defendant's testimony and that of the witnesses. The questions did not call on defendant to characterize Sloane and Michel as liars. The jury, moreover, was instructed under CALJIC No. 2.20 that they were the sole judges of the believability of a witness.

### c. *Challenge Regarding Defendant's Testimony*

Defendant contends the prosecutor's questions regarding his inability to tell his wife about discovering Powell's body at the crime scene were argumentative. On cross-examination, defendant testified that he did not inform his wife about finding Powell's body because he was "scared" and "didn't have the courage" to tell her. In response, the prosecutor asked defendant whether he thought his wife would have put a bag over his head and tortured him[13] if he

---

[13] Defendant testified earlier that he was a police officer in Guatemala and had observed the torturing of suspects: "Well, when I was—where I was at, I was at the border in San Marcos, they just use the hood there, and some blow, some small blows. That's all. But it was enough for a person to be careful because as soon as they put the hood on and he would start choking so he would give in . . . . The hood is something like a plastic—and if the person is very suspicious to them like they really think they did something, they put some kind of a powder like . . . . [¶] It's a powder named gamsen, g-a-m-s-e-n, that is . . . an insecticide, they don't put very much, a little bit, place it on his head, covering his face up, and it's got like a—like a tie, it's closed up . . . so it remains closed. So people can't breathe. [¶] And then after a little while then when they know nothing's happened to the person, they remove it, the person is kind of half dead though."

told her what he had observed. Defendant claims the prosecutor's question was argumentative and constituted misconduct.

No misconduct occurred. As stated, an argumentative question is designed to engage a witness in argument and is improper. (*People v. Mayfield, supra,* 14 Cal.4th at p. 755.) Here, the prosecutor properly challenged defendant regarding his explanation that he was "scared" and "didn't have the courage" to tell his wife about discovering Powell's body. The prosecutor's questions served to highlight for the jury the improbability of defendant's explanation. (See, e.g., *People v. Bemore* (2000) 22 Cal.4th 809, 847 [94 Cal.Rptr.2d 840, 996 P.2d 1152] ["the prosecutor simply employed a rhetorical device calculated to focus the jury's attention on strong circumstantial evidence of guilt and on any corresponding weaknesses in the defense case"].)

### d. *Questioning Regarding Inconsistencies in Defendant's Testimony*

On direct examination, defendant testified inconsistently regarding the events that prompted him to go over to Powell's house after all of the construction workers had left for the day. He first described hearing "two voices like something was happening" but said he "heard a woman's voice." Defendant testified he was unable to understand the voices because they were speaking in English. He then said he heard "just a woman's voice" and "then two voices." He described the voices as "not normal voices." Defendant subsequently clarified he heard two voices that made loud sounds associated with pain. He did not hear any words.

On cross-examination, the prosecutor followed up on this issue:

"[The Prosecutor]: Sir, were these two women saying words in the English language?

"[Defendant]: The two ladies?

"[The Prosecutor]: Yes.

"[Defendant]: What two ladies?

"[The Prosecutor]: You—are you just making this up as you go along?

"[Counsel]: I am going to object [to] that; that's argumentative, Your Honor. It's not a question.

"THE COURT: Overruled.

"[The Prosecutor]: [A]re you making this up as you go along?

"[Defendant]: You are asking me about the two ladies?

"[The Prosecutor]: No, I am asking you whether you are just making this up as you go along.

"[Defendant]: I'm not making anything up."

On appeal, defendant contends that he did not understand and was confused by many of the prosecutor's questions. For this reason, he claims the prosecutor's questions in the preceding exchange were sarcastic and abusive and constituted misconduct. We find no misconduct. As the People point out, because defendant's testimony regarding the voices he heard coming from Powell's house was riddled with inconsistencies, the prosecutor could properly test defendant's veracity in this area and highlight any inconsistencies. Moreover, the jury heard defendant's testimony and could evaluate whether his inconsistencies were the result of his language difficulties or lack of candor.

### e. Questioning Regarding Defendant's Actions After Discovering Powell's Body

Defendant testified that he did not remember washing any blood off of himself after finding Powell's body, but he admitted that he must have done so in the pool at the house under construction. The prosecutor repeatedly questioned defendant's memory in this area and finally asked him if he was afraid to admit to the jury that he washed the blood off of himself. The trial court overruled counsel's objection that the question was argumentative.

On appeal, defendant contends the prosecutor engaged in misconduct because the question was argumentative and suggested he was trying to hide something even though he admitted he must have washed any blood off. We conclude no misconduct occurred. Evidence of defendant's specific conduct was relevant and admissible on the issue of his credibility. (*People v. Harris* (1989) 47 Cal.3d 1047, 1080–1082 [255 Cal.Rptr. 352, 767 P.2d 619].) Thus, the prosecutor could properly focus on defendant's testimony regarding his specific actions after he left Powell's house to determine whether defendant's conduct was consistent with attempting to help Powell or with covering up evidence of her murder.

### f. Cumulative Impact of Alleged Prosecutorial Misconduct

Defendant contends the numerous instances of alleged misconduct rendered his trial fundamentally unfair, in violation of his federal constitutional

right to due process and a reliable verdict. Because we have concluded no misconduct occurred, his claim fails.

### 3. Sufficiency of Evidence of Attempted Rape

The trial court found the evidence was insufficient to instruct the jury on a theory of premeditated and deliberate murder. Accordingly, the prosecution's sole theory supporting defendant's first degree murder conviction and the related rape-murder special-circumstance finding was felony murder during an attempted rape. Defendant contends the evidence is insufficient to establish Powell was murdered during an attempted rape, and this court must reverse his first degree felony-murder conviction and strike the related rape-murder special-circumstance finding. In the alternative, he argues we should reduce his conviction to second degree murder.

In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319–320 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Kraft, supra,* 23 Cal.4th at p. 1053.)

The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. (*People v. Maury, supra,* 30 Cal.4th at p. 396.) "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam, supra,* 28 Cal.4th at p. 143.) We do not reweigh evidence or reevaluate a witness's credibility. (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.)

A killing "committed in the perpetration of, or attempt to perpetrate" one of several enumerated felonies, including rape, is first degree murder.[14] (§ 189.) The rape-murder special circumstance equally applies to a murder "committed while the defendant was engaged in . . . the commission of, [or] attempted commission of" rape. (§ 190.2, subd. (a)(17)(C)); see *People v. Kelly*

---

[14] The trial court instructed the jury that a killing "which occurs during the attempted commission of the crime of rape is murder of the first degree when the perpetrator had the specific intent to commit such crime." (CALJIC No. 8.21.)

(1992) 1 Cal.4th 495, 524–525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence. (§ 261, subd. (a)(2); *People v. Maury, supra,* 30 Cal.4th at p. 427.) An attempt to commit rape has two elements: the specific intent to commit rape and a direct but ineffectual act done toward its commission. (See *People v. Carpenter, supra,* 15 Cal.4th at p. 387.) The act must be a direct movement beyond preparation that would have accomplished the crime of rape if not frustrated by extraneous circumstances. (*Ibid.*) An actual element of the offense, however, need not be proven. (*People v. Dillon* (1983) 34 Cal.3d 441, 454, 456 [194 Cal.Rptr. 390, 668 P.2d 697] [attempted robbery].)

 Intent to commit rape is the intent to commit the act against the will of the complainant. (See, e.g., *People v. Maury, supra,* 30 Cal.4th 342, 400 [assault with intent to commit rape]; *People v. Ghent* (1987) 43 Cal.3d 739, 757 [239 Cal.Rptr. 82, 739 P.2d 1250] [an assault with intent to commit rape and an attempted rape require the same specific intent].) A defendant's specific intent to commit a crime may be inferred from all of the facts and circumstances disclosed by the evidence. (*People v. Craig* (1994) 25 Cal.App.4th 1593, 1597 [31 Cal.Rptr.2d 96]; see also *People v. Cain* (1995) 10 Cal.4th 1, 47 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [burglary].)

Defendant first contends the evidence shows, at most, a sexual interest in Powell that cannot be equated with an intent to rape. Second, he contends because there was no physical evidence of a sexual attack, there was no evidence of attempted rape. We disagree and conclude the jury could reasonably infer defendant's intent to have nonconsensual intercourse with Powell by force and further find his actions at least went beyond mere preparation and constituted direct but ineffectual acts toward the attempted commission of a rape.

In older cases involving a charge of sexual assault, in the absence of physical evidence that a sexual assault had occurred (e.g., the presence of semen or vaginal trauma), the court declined to infer an intent to commit a sexual assault on the victim, even if the victim was unclothed. (See, e.g., *People v. Granados* (1957) 49 Cal.2d 490, 497 [319 P.2d 346]; *People v. Craig* (1957) 49 Cal.2d 313, 318–319 [316 P.2d 947]; *People v. Anderson* (1968) 70 Cal.2d 15, 35 [73 Cal.Rptr. 550, 447 P.2d 942].) Recently, we distinguished these decisions by noting the lack of semen or absence of sexual trauma on the victim did not rebut an inference, based on the other physical evidence surrounding the attack, that the defendant entered the victim's house with an intent to rape. (*People v. Holloway* (2004) 33 Cal.4th 96, 138–139 [14 Cal.Rptr.3d 212, 91 P.3d 164].) We concluded there was sufficient evidence from which the jury could reasonably infer the defendant's intent to rape,

notwithstanding the absence of physical evidence the victim suffered a sexual assault. (*Ibid.*) The jury could reasonably infer defendant's intent to rape from the condition of the victim's body and evidence of the defendant's attempted rape of the victim's sister. (*Ibid.*) Here, as in *Holloway*, despite the lack of physical evidence Powell had suffered a sexual assault, we conclude sufficient evidence established defendant intended to rape her.

The record establishes defendant's escalating sexual interest in Powell. A few days before the murder, as defendant sat around the remodeling site with other coworkers, he used the word "panocha," a slang term for female genitalia, in reference to Powell as he gyrated his hips in a sexual manner. On the day of the murder, defendant repeatedly entered Powell's property and house. In the morning, defendant walked through Powell's utility room door and into her kitchen. Powell asked Braziel to take defendant back to the remodeling site. After lunch, Braziel found defendant standing alone on Powell's back patio. Around 2:30 p.m., Sloane, the remodeling contractor, heard the gate to Powell's backyard close and saw defendant emerge from the hedge separating the properties. When Sloane asked defendant why he was next door and not working, defendant apologized and assured him it would not happen again. Later, after defendant had stepped through Powell's patio door and into her den, Powell again asked Braziel to take defendant back to the remodeling site. Defendant repeatedly chanted "Kathy for me, me for Kathy" and gyrated his hips in a sexual manner. Braziel tried to persuade defendant to leave and told him, "[N]o, Francisco, Powell's like being a nice person. She don't like you that way. She likes you like a friend." Defendant responded by continuing to repeat his "Kathy for me, me for Kathy" chant and gyrating his hips. Still later, Canale, the electrical contractor, observed defendant alone inside Powell's utility room, drinking a brown beverage.

In addition, the evidence shows defendant fabricated a reason for remaining at the remodeling site after all of the construction workers had left for the day. At trial, defendant claimed that he told Antonio Flores, a coworker, he intended to stay at the site until his boss, Kevin Cozen, returned. However, Cozen testified he had made no arrangement to meet defendant at the site in the afternoon.

Defendant also had asked Michel, a neighbor who was walking by the remodeling site after 4:00 p.m., whether she had come from Powell's house, and she replied, "No." A jury could reasonably infer from such evidence that defendant planned to catch Powell alone after the other construction workers had left.

Evidence of Powell's injuries also supports a conclusion that defendant attempted to rape her and stabbed her to death when she resisted having sex

with him. The most telling of Powell's injuries are the poke wounds and the slash wound on each of Powell's breasts. The wounds were essentially parallel and indicate defendant deliberately poked Powell in one breast with the tip of his knife and then poked her in the other breast in the same manner. Then, after poking her breasts, defendant slit one of Powell's breasts open and slashed the other. Such wounds obviously were not accidental. A jury could reasonably infer that by inflicting these wounds, defendant intended to force Powell to do something against her will. The nature and location of Powell's injuries—considered in conjunction with the above circumstantial evidence of defendant's escalating sexual interest in Powell, demonstrated persistence in entering Powell's house, and efforts to ensure that he would be alone with Powell at the end of the day—supports the jury's finding that defendant intended to force Powell to submit to his sexual intent.

Defendant argues that myriad circumstances were presented by the evidence and that an attempted rape was not the only explanation that accounted for Powell's murder. For example, assuming he poked Powell's breasts with a knife, he maintains the evidence suggests equally that those wounds were inflicted as a result of his taunting her for having rejected his sexual advances rather than attempting to force her to have sexual intercourse with him. But the defense offered no evidence at trial to contest the People's evidence that defendant acted with intent to rape Powell. Defendant testified he was not interested in Powell romantically and found her upon hearing her screams, implying that some unidentified third party must have attacked her in her utility room and stabbed her to death. The jury obviously did not believe his version of events. His defense at trial thus provides no support for his argument on appeal that the People's evidence was insufficient to establish his intent to rape Powell. The jury could have reasonably inferred that defendant assaulted Powell with the intent to rape.

Further, the jury could have reasonably found defendant's conduct constituted a direct but ineffectual act in furtherance of his intent to rape, thereby establishing his attempted rape of Powell. (*People v. Carpenter, supra*, 15 Cal.4th at p. 387.) Proof of even slight acts beyond preparation done in furtherance of the intent to rape will constitute an attempt. (*People v. Memro* (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832]; *People v. Dillon, supra*, 34 Cal.3d at p. 456.) Under the prosecution's theory, defendant's infliction of poke wounds on Powell's breasts, while she was alive, constituted an act in furtherance of an attempted rape. Defendant complains that the poke wounds were not necessarily inflicted in a sexual manner and that some sort of physical sexual assault is required to establish attempted rape. Not so. In *Carpenter, supra*, 15 Cal.4th at page 387, we declined to hold that an *attempted* rape requires " 'some physical conduct of a distinctly and unambiguously sexual nature.' " (See also *People v. Kipp* (1998) 18 Cal.4th

349, 376–377 [75 Cal.Rptr.2d 716, 956 P.2d 1169] [a demand for oral copulation followed by the actual or attempted use of force constitutes more than mere preparation].)

Here, consistent with the prosecution's theory, the jury could reasonably find that defendant attempted consensual sexual intercourse with Powell, was rejected by her, and then attempted to force her to comply by poking her breasts with the tip of his knife.[15] In doing so, defendant's use of force amounted to more than mere preparation and progressed into an attempted rape. (*People v. Carpenter, supra,* 15 Cal.4th at p. 387.)

For these reasons, we conclude the evidence is sufficient to support the jury's finding that defendant killed Powell during an attempted rape and, accordingly, defendant's first degree felony-murder conviction and the related rape-murder special-circumstance finding.

### 4. *Attempted Rape Special Circumstance*

Here, defendant contends that, as a matter of law, the attempted-rape allegation cannot sustain the rape-murder special circumstance in this case because Powell's murder was not committed to advance the attempted rape. We disagree.

In *People v. Kelly, supra,* 1 Cal.4th at p. 526, we affirmed that a murder committed during an attempted rape can support both a felony-murder conviction and a rape special-circumstance finding. A finding that a killing occurred in the commission of a felony requires that "the two 'are parts of one continuous transaction.'" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1085 [25 Cal.Rptr.2d 867, 864 P.2d 40].) "The rape-murder special circumstance requires that the rape not be merely incidental to the murder but does not require that the intent to kill arise *after* the rape or attempt to rape." (*People v. Carpenter, supra,* 15 Cal.4th at p. 388.) The jury must find that the defendant committed murder "in order to advance an independent felonious purpose." (*People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].) In this case, evidence that defendant desired to have sexual intercourse with Powell, attempted to kiss her, and entered her house without permission

---

[15] The dissent suggests in the alternative that "[t]he physical evidence allowed a reasonable inference that defendant tortured and killed Powell out of anger because she refused him or out of jealousy over her friendship with his coworker, Braziel." (Dis. opn., *post,* at p. 1167.) As stated, however, the existence of alternative theories does not render the evidence of defendant's felony-murder conviction insufficient. (*People v. Farnam, supra,* 28 Cal.4th at p. 144.) "Because the circumstances reasonably justify the jury's findings, we may not reverse the judgment simply because the circumstances might also reasonably be reconciled with defendant's alternative theories." (*Ibid.*)

strongly suggests his primary motivation was rape "or at least that the [attempted] rape was an 'independent purpose.' " (*People v. Carpenter, supra,* 15 Cal.4th at p. 387.) Accordingly, defendant's claim of error fails.

### 5. *Instructional Issues*

#### a. *Instruction Regarding Motive (CALJIC No. 2.51)*

The trial court instructed the jury with the standard instruction regarding motive.[16] Defendant contends the motive instruction was erroneous on three grounds. The People argue these issues are not cognizable because defendant failed to object on these grounds at trial. For reasons explained *post,* we agree with the People in part.

Defendant initially complains the motive instruction shifted the prosecution's burden of proof to imply he had to prove his innocence. Despite his failure to object to this instruction on this basis, the claim is cognizable on appeal because it implicates his substantial rights. (*People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302]; § 1259.) Nonetheless, we have previously rejected this claim (*People v. Cleveland, supra,* 32 Cal.4th at p. 750), and defendant offers no persuasive reason to revisit our decision. (See also *People v. Prieto* (2003) 30 Cal.4th 226, 254 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [no reasonable juror would consider CALJIC 2.51 an instruction or standard of proof instruction distinct from the reasonable doubt standard set forth in CALJIC 2.90].)

Defendant next argues the motive instruction erroneously informed the jury that evidence of motive alone was sufficient to establish guilt because, unlike the court's instruction on consciousness of guilt, the motive instruction did not explicitly state that evidence of motive alone is *not* sufficient to prove guilt. (*People v. Cleveland, supra,* 32 Cal.4th at p. 750.) This claim is not cognizable, however, because defendant was obligated to request clarification and failed to do so. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [117 Cal.Rptr.2d 45, 40 P.3d 754] [a party must request a clarifying instruction in order to argue on appeal that an instruction correct in law was too general or incomplete].) In any event, we find no error in the instruction and no prejudice. The jury was properly instructed on the reasonable doubt standard. We find no reasonable likelihood the jury would interpret the instruction as stating that motive alone was sufficient to prove defendant's guilt. (*People v.*

---

[16] "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give the presence or absence, as the case may be, the weight to which you find it to be entitled." (CALJIC No. 2.51.)

*Cleveland, supra*, 32 Cal.4th at p. 750.) Certainly, the jury's verdict in this case was not based solely on motive.

Defendant further argues the motive instruction relieved the prosecution of its burden of proving beyond a reasonable doubt defendant possessed the requisite intent to rape when he killed Powell. He asserts that motive and intent were indistinguishable in this case and that the jury would not have been able to distinguish instructions involving motive and intent. This issue is cognizable on appeal even absent defendant's objection at trial. (§ 1259; *People v. Hillhouse, supra*, 27 Cal.4th at p. 503 [no objection required for appellate review because instructions involving an element of the crime affect the substantial rights of the defendant].) But defendant's claim lacks merit.

In *People v. Maurer* (1995) 32 Cal.App.4th 1121 [38 Cal.Rptr.2d 335], which defendant cites, the defendant was convicted of misdemeanor child annoyance under section 647.6. To prove the mental state element of the offense, the prosecution had to show that the defendant's conduct was motivated by an unnatural or abnormal sexual interest. (*People v. Maurer, supra*, 32 Cal.App.4th at pp. 1126–1127.) The jurors were told by one instruction that the defendant's conduct must be "motivated" by an unnatural or abnormal sexual interest and by another that "motive" need not be established. (*Ibid.*) The Court of Appeal held the conflicting instructions erroneously removed the issue of intent from the jury's deliberations. (*Ibid.*)

This case is distinguishable. We have explained that "[m]otive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse, supra*, 27 Cal.4th at p. 504.) Here, although the intent to commit rape was an element of the offense, motive was not. Moreover, the trial court instructed the jury that to find the rape-murder special circumstance, it must find the "murder was committed in order to carry out or to advance the commission of the crime of attempted rape" and the special circumstance "is not established if the attempted rape was merely incidental to the murder." Consequently, the instructions as a whole did not refer to motive and intent interchangeably. We find no reasonable likelihood that the jury understood those terms to be synonymous. (*People v. Cash* (2002) 28 Cal.4th 703, 739 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

b. *The Special Circumstance Instruction*

With respect to the special circumstance of murder in the commission of an attempted rape, the trial court instructed the jury as follows:

"To find that the special circumstance, referred to in these instructions as murder in the commission of attempted rape is true, it must be proved:

"1. The murder was committed while the defendant was engaged in the attempted commission of a rape; and

"2. The murder was committed in order to carry out or advance the commission of the crime of attempted rape *or to avoid detection.* In other words, the special circumstance referred to in these instructions is not established if the attempted rape was merely incidental to the commission of the murder." (CALJIC No. 8.81.17, italics added.)

Defendant contends first that the trial court erred by refusing his request to delete the phrase "or to avoid detection" from the instruction on the ground that there was no evidence the killer murdered Powell to avoid detection. We disagree. The jury could reasonably infer that defendant murdered Powell either to carry out or advance the attempted rape or to avoid detection, or both. Indeed, no other reason for his killing Powell readily appears. Any of these purposes would suffice to support the special circumstance. Nothing required the trial court to limit the jury to one choice or the other.

Defendant also maintains that the instruction permitted the jury to make the special-circumstance finding in the absence of evidence of an attempted rape because the jury could find the special circumstance true by simply finding he tried to avoid detection "of whatever he had done up to that point." Defendant's argument is premised on an unreasonable interpretation of the instruction. To find defendant guilty of first degree felony murder, the jury was instructed it had to find defendant had the specific intent to commit rape and that the attempted rape was proven beyond a reasonable doubt. (CALJIC Nos. 3.31, 8.21.) The challenged instruction further required that the jury had to find the murder was committed while the defendant was engaged in the attempted commission of a rape *and* the rape was not merely incidental to the murder. The jury was also instructed to consider the instructions "as a whole" and to not single out any particular point or instruction and ignore the others. (CALJIC No. 1.01.) Therefore, as applied to this case, the special-circumstance instruction required that Powell's murder was committed to avoid the detection of an attempted rape.

We conclude, based on the totality of the instructions given, there is no reasonable likelihood the jury misconstrued or misapplied the instructions. (*People v. Maury, supra,* 30 Cal.4th at p. 437.)

### c. *Consciousness of Guilt Instructions*

Evidence established, and defendant conceded, he made false and misleading statements to the police and his wife. As a result, the trial court instructed the jury, as follows: "If you find that before this trial the defendant made a

willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." (CALJIC No. 2.03.)

Defendant also provided police officers with clothing he claimed he wore on the day of Powell's murder. He told Detective Wachter he had not washed the clothes. Based on this evidence, the trial court gave the following instruction: "If you find that a defendant attempted to or did fabricate evidence to be produced at the trial, such conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your determination." (CALJIC No. 2.04.)

On appeal, defendant contends the consciousness of guilt instructions were impermissibly argumentative and improperly allowed the jury to make unreasonable inferences regarding his mental state during the commission of the offenses. We have considered and rejected similar arguments in prior cases. (*People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Kipp, supra,* 18 Cal.4th at p. 375, and cases cited; *People v. Holt* (1997) 15 Cal.4th 619, 678 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140–1141 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 128 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Defendant offers no persuasive reason for us to revisit these decisions.

### d. *Definition of Rape*

The trial court instructed the jury on first degree felony murder, as follows: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the attempted commission of the crime of rape is murder of the first degree when the perpetrator had the specific intent to commit such crime.

"The specific intent to commit rape and the attempted commission of such crime must be proved beyond a reasonable doubt.

"As used in this instruction, the word 'rape' means engaging in an act of sexual intercourse with a female person, who is not the spouse of the perpetrator, accomplished against such person's will by means of force, violence, or fear of immediate and unlawful bodily injury to such person." (CALJIC No. 8.21.)

Defendant contends the definition of rape included in this instruction was deficient because it failed to define "sexual intercourse." We disagree.

As a preliminary matter, the People argue defendant has forfeited this claim because he failed to request a clarifying instruction at trial. Generally, a claim of instructional error is not cognizable on appeal if the instruction is correct in law and the defendant fails to request a clarification instruction. (See, e.g., *People v. Catlin* (2001) 26 Cal.4th 81, 149 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Here, however, because the asserted error consists of a failure to instruct on an essential element of the offense of rape as included in the felony-murder charge and affects his substantial rights, his failure to object does not preclude our review of this issue. (See, e.g., *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

 Contrary to defendant's assertion, "sexual intercourse" is not a technical term with various meanings that might be misunderstood when used to define rape. (See *People v. Holt, supra,* 15 Cal.4th at p. 676 [In the context of rape, "sexual intercourse" requires penetration of the victim's vaginal genitalia by the male sex organ].) In *Holt,* we rejected defendant's argument that the trial court erred by failing to define "sexual intercourse" in the context of rape. The term "sexual intercourse" was placed in proper context by other instructions given in that case and by the arguments of counsel. (*Ibid.*)

Defendant asserts there was no similar clarification in this case, but we disagree. It was undisputed that the offense was *attempted* rape, not rape, and required no penetration. (*People v. Ray* (1961) 187 Cal.App.2d 182, 189 [9 Cal.Rptr. 678] ["Rape requires penetration, however slight."].) Defense counsel argued the lack of evidence of attempted rape, as follows: "There was no . . . tearing or attempted removal of . . . Powell's clothes. *No penetration or attempted penetration of the vaginal area.* No evidence of any words or acts that would indicate an intent to take a woman by force or against her will."

We agree with the People that there is no possibility that the jury misunderstood the term "sexual intercourse" in the context of the definition of rape.

e. *Instructions Regarding the Reasonable Doubt Standard*

Defendant contends a number of instructions given to the jury (CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.22, 2.51, 8.83.1) were unconstitutional because they misled jurors regarding the reasonable doubt standard and impermissibly lightened the prosecution's burden of proof. Each of his contentions is without merit.

Defendant initially challenges three interrelated instructions on circumstantial evidence: CALJIC No. 2.01 (sufficiency of circumstantial evidence—

generally); CALJIC No. 2.02 (sufficiency of circumstantial evidence to prove specific intent or mental state); and CALJIC No. 8.83.1 (special circumstances—sufficiency of circumstantial evidence to prove required mental state). Defendant argues these instructions (1) misled the jury into believing it could find him guilty if he "reasonably appeared guilty" regardless of any reasonable doubt they may entertain as to his guilt, and (2) effectively reversed the burden of proof and required the jury to find him guilty unless he came forward with evidence of his innocence. We have repeatedly rejected these arguments, and defendant offers no persuasive reason to reconsider our prior decisions. (*People v. Nakahara, supra,* 30 Cal.4th at p. 714; *People v. Hughes* (2002) 27 Cal.4th 287, 346–347 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Riel* (2000) 22 Cal.4th 1153, 1200 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Crittenden, supra,* 9 Cal.4th at p. 144.)

Defendant next argues that CALJIC No. 1.00 (defendant's arrest and prosecution not used to infer he is "more likely to be guilty than innocent") and CALJIC No. 2.51 (presence of motive may establish guilt) misled the jury because they undercut the prosecution's burden of proof by failing to emphasize the central issue in a criminal trial is not simply guilt or innocence but whether guilt had been established beyond a reasonable doubt. But we have rejected this argument as well. (*People v. Nakahara, supra,* 30 Cal.4th at p. 714; *People v. Frye* (1998) 18 Cal.4th 894, 957–958 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

Defendant's contention that CALJIC No. 2.21.2 (witness willfully false) impermissibly lightened the prosecution's burden of proof, because it allowed the jury to assess prosecution witnesses by seeking only a probability of truth in their testimony, has recently been rejected. (See *People v. Nakahara, supra,* 30 Cal.4th at p. 714; *People v. Hillhouse, supra,* 27 Cal.4th at p. 493.)

We also have recently rejected defendant's claim that CALJIC No. 2.22 (weighing conflicting testimony) directed the jurors to evaluate the evidence by looking at its "convincing force" rather than the "relative number" of testifying witnesses and in doing so, improperly "replaced" the beyond reasonable doubt standard with a standard akin to a preponderance of evidence standard. (*People v. Nakahara, supra,* 30 Cal.4th at pp. 714–715.)

### D. *Penalty Phase Issues*

#### 1. *Evidentiary Issues*

##### a. *Admissibility of Hearsay Statement That Defendant Had Killed Other People in Guatemala*

Prosecution witness Angela Guerra de Maderos testified on direct examination that on an evening in 1980, she was walking home through the countryside in Guatemala and defendant attacked her and threatened to rape and kill her. He kicked her to the ground and poked her throat with a machete. Defendant left de Maderos when her husband and son approached and fired a shot. On cross-examination, de Maderos explained that after the attack she went to the police and made a report, but on the advice of her sons she did not identify defendant as her assailant. After that, she made no further report of the incident. In rebuttal, over counsel's hearsay objection, de Maderos testified that she did not report the attack, in part, because she feared defendant would kill her as she had heard he was a violent person who had killed other people. The court instructed the jury of the limited purpose for which it could consider this testimony.[17]

Defendant contends the trial court erred in admitting de Maderos's testimony that she had heard defendant was violent and had killed people because her testimony was improper hearsay and inherently untrustworthy. On appeal, we apply an abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. (*People v. Alvarez, supra,* 14 Cal.4th at p. 201.) Based on our review, we conclude the trial court did not abuse its discretion in admitting de Maderos's testimony.

To be hearsay, a statement must be "offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Here, the prosecution did not offer, and the jury was not permitted to consider, de Maderos's testimony about fearing defendant for the truth of the matter asserted but for the *nonhearsay*

---

[17] The trial court instructed the jury as follows: "The jury is admonished that this question—this answer that the witness has given to that question where she said yes, is not proof that the defendant is—was a violent person or that he had killed anybody. We're dealing here solely with the state of mind of this witness. That is, she's giving an explanation for her conduct based upon what she had in her mind. Whether those things are true or not is not the issue. [¶] The issue is whether this witness believed them and she's offering that as a reason why she did not further report the matter. And that's the sole purpose for which the answer is received. [¶] You're the ones to assess the credibility of this witness, you're the ones to assess her reasons, if any, that she gives for things that she did or didn't do. [¶] But you are not to take from her answer that the defendant was a violent person or that he had killed anybody. [¶] All that's relevant here is whether or not you believe that this witness heard such things and if she did, that it affected her and caused her not to report this matter."

purpose of explaining why she did not report the attack. Her explanation was probative because defense counsel suggested during cross-examination that her conduct was inconsistent with being the victim of such an attack. The trial court carefully admonished the jury that de Maderos's testimony that she had heard defendant was violent and had killed people was being admitted solely to explain her failure to report the attack and not for its truth. The import of her testimony was not whether defendant was violent and had killed in Guatemala, but whether de Maderos failed to report the attack because she believed he was violent. Thus, the testimony was properly admitted for a *nonhearsay* purpose. (*People v. Armendariz* (1984) 37 Cal.3d 573, 585 [209 Cal.Rptr. 664, 693 P.2d 243].)

 Defendant's argument that de Maderos's testimony was inadmissible because her testimony was untrustworthy is misplaced. "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.)

### b. Admissibility of Testimony That Witnesses Feared Retribution Because They Testified Against Defendant

De Maderos testified, over defense counsel's objections, that she was worried that "something might happen to [her]" when she returned to Guatemala after testifying because she believed defendant's family "might not take [her testimony] well." De Maderos further testified she had "heard it being said that if we came here to testify, the only pleasure we would have would be to come, but that something might happen to us when we returned." Edgar Ramirez also testified over counsel's objections that he was concerned about his family upon returning to Guatemala and worried that someone might hurt him because he was testifying in this case. He had received no direct threat nor heard any talk in his hometown in Guatemala that he would be in danger when he returned home after testifying.

 On appeal, defendant contends the trial court erred in admitting their testimony that they were afraid of the consequences of testifying against defendant when they returned to Guatemala. We find no abuse of discretion in permitting de Maderos and Ramirez to testify regarding their fear of testifying against defendant. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener*, *supra*, 29 Cal.4th at p. 869; see Evid. Code, § 780, subd. (f) [jury may consider the existence or nonexistence of a bias, interest, or other motive in determining a witness's credibility].) An

explanation of the basis for the witness's fear is likewise relevant to the jury's assessment of his or her credibility and is well within the discretion of the trial court. (*Burgener, supra*, at p. 869.) For such evidence to be admissible, there is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is "directly linked" to the defendant. (*People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588 [28 Cal.Rptr.2d 897].)

Here, evidence that de Maderos feared retaliation for testifying against defendant was offered for the nonhearsay purpose of explaining inconsistencies in portions of her testimony, including her equivocal responses when asked whether she feared retaliation. Ramirez's testimony that he feared testifying was also relevant to his credibility even though he testified he had not personally received or heard of any threat. (See, e.g., *People v. Avalos* (1984) 37 Cal.3d 216, 232 [207 Cal.Rptr. 549, 689 P.2d 121] [witness's fear was caused only by the nature and gravity of her testimony].) Moreover, as the People point out, the record suggests the witnesses exhibited hesitancy in responding to questions. The jury was entitled to consider their explanations in evaluating their credibility, and the trial court instructed the jury accordingly. Importantly, the trial court further admonished the jurors that if they believed the statements were made, they must not attribute them to defendant. Accordingly, the trial court properly exercised its discretion in admitting their testimony.

> c. *Admissibility of Ramirez's Testimony That Defendant's Family Had Offered Him Money to Not Testify*

In addition to testifying about his fear of testifying, Ramirez also testified, over counsel's objections, that defendant's sister, identified only as "Mary," offered to give him money to not testify in this case.[18] He declined the offer and stated he would not accept any money. Defendant now argues the trial court erred in admitting this evidence on the grounds it was irrelevant hearsay and prejudicial. We disagree. "Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368–1369 [37 Cal.Rptr.2d 596]), the fact that a witness declined an offer for financial gain in exchange for his silence is likewise relevant in evaluating his or her credibility. In this case, evidence that Ramirez was offered money to *not* testify was properly admitted for the nonhearsay purpose of assessing his state of mind at trial and the effect, if any, on his credibility. Therefore, the trial court did not err in admitting the evidence.

---

[18] Ramirez testified that Mary told him if de Maderos gave him any money to testify in this case, she would give him money as well in order not to come to trial. Outside the presence of the jury, Ramirez denied that de Maderos gave him money to testify regarding her attack by defendant.

The trial court properly instructed the jury that the evidence was limited to their consideration of Ramirez's credibility. Moreover, the court admonished the jury that the evidence must not be attributed to defendant because there was no evidence of his involvement in either making the offer or causing the offer to be made.

### d. Exclusion of Testimony from Rego Roberto Maderos Regarding the Identity of His Mother's Attacker

During pretrial interviews, de Maderos denied that she told her son, Rego Roberto de Maderos (Rego Roberto), that she did not recognize her attacker. She stated she recognized defendant's voice. During Rego Roberto's interview, he stated that at the time of the attack, his mother stated, "I didn't recognize him." Defense counsel sought to introduce this statement to rebut the prosecution's evidence that defendant attacked de Maderos and sought an evidentiary hearing under Evidence Code section 402.

Rego Roberto would have testified that at the time de Maderos was attacked, he was working in a nearby field when he heard her scream and ran to her. He asked de Maderos, "What happened to you, mother?" She answered that a man wanted to kill her and that his "face was covered." When Rego Roberto asked her, "Who could it be?," she replied "I didn't recognize him." Rego Roberto would have testified further that the attacker did not leave a machete behind, that defendant was not the attacker, and that he considered defendant to be a nice person. The trial court denied defendant's motion on the grounds Rego Roberto was not competent to testify about the attack because he did not witness it and his belief that someone else attacked de Maderos was irrelevant.

During the penalty phase, defendant renewed his motion for the admission of Rego Roberto's testimony, specifically his statement that he told his mother someone else attacked her. The court denied his motion, explaining that Rego Roberto's testimony was inadmissible because he did not witness the attack, his testimony was offered on a collateral issue, and his testimony was based on rumors. In addition, the court ruled the testimony was inadmissible under Evidence Code section 352 on the grounds it would mislead the jury and necessitate undue consumption of time.

On appeal, defendant contends that the trial court erred in excluding the proffered testimony on the ground that de Maderos's statement that she did not recognize her attacker was admissible as a prior inconsistent statement.

(Evid. Code, § 1235).[19] The People argue defendant forfeited this issue because he failed to object on this ground at trial. We disagree. To preserve for appeal an alleged error in excluding evidence, a party must make an offer of proof informing the trial court of the "purpose, and relevance of the excluded evidence." (Evid. Code, § 354, subd. (a); see *People v. Valdez* (2004) 32 Cal.4th 73, 108 [8 Cal.Rptr.3d 271, 82 P.3d 296].) In this case, defense counsel's written motion made clear he sought admission of Rego Roberto's testimony to rebut de Maderos's testimony that she was assaulted by defendant in Guatemala. We find this offer of proof adequate to preserve the issue.

■ Evidence that de Maderos told her son that she did not recognize her attacker would have been admissible as a prior inconsistent statement. Evidence Code section 1235 states, in pertinent part: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his [or her] testimony at the hearing . . . ." Prior inconsistent statements are admissible under this provision to prove their substance as well as to impeach the declarant. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 55, fn. 4 [14 Cal.Rptr.2d 133, 841 P.2d 118].) In this case, de Maderos's testimony at trial identifying defendant as her attacker was inconsistent with the proffered testimony that shortly after the attack she said she did not recognize her attacker.

Nonetheless, error in excluding this evidence was harmless. De Maderos was impeached by counsel when she revealed on cross-examination that prior to giving her testimony on direct examination, she had not mentioned that she saw defendant's face during the attack. During previous interviews, she stated that defendant's face was covered by a bandana and that she recognized him only by his voice. In addition, de Maderos gave equivocal or ambiguous answers when asked why she failed to report the attack and whether she feared retaliation for testifying against defendant. Under these circumstances, there is no reasonable possibility that further impeachment of de Maderos regarding her identification of defendant as her attacker would have affected the verdict. (*People v. Jones* (2003) 29 Cal.4th 1229, 1265, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762]; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442] [with respect to penalty phase

---

[19] Defendant also contends that Rego Roberto's anticipated testimony that there was no machete left at the scene of the attack was admissible to impeach de Maderos's testimony that defendant left a machete sheath at the scene or to establish the existence of another Francisco Guerra who was an enemy of the de Maderos family. We disagree on both counts. The fact that Rego Roberto did not see a machete at the scene does not impeach de Maderos's testimony that defendant left his machete *sheath* with the initials F.G. at the scene. Further, defendant's assertion that Rego Roberto's testimony "could have established that there was another person named 'Francisco Guerra' " is speculative and lacks evidentiary support. Finally, Rego Roberto's opinion that defendant was a "nice person" and not "our enemy" was irrelevant and inadmissible to impeach de Maderos regarding her failure to report the attack.

error, our state law reasonable possibility standard is equivalent to the harmless beyond a reasonable doubt standard of *Chapman v. California, supra*, 386 U.S. at p. 24, which governs federal constitutional error].)[20]

### e. *Exclusion of Photograph Offered in Mitigation*

During the penalty phase, defendant offered three photographs as mitigating evidence: a photograph of defendant's home in Guatemala and his three children; a photograph of his three children at the time of trial; and a photograph of his horse and three children at the time they lived with defendant in Guatemala. Counsel argued the photograph of the horse and defendant's children was relevant to show defendant and his family as they lived in Guatemala. He added the photograph also was relevant to show the horse defendant rode when he gave medical attention to people in the village. The trial court admitted the photograph of defendant's children at their home in Guatemala and the photograph of the children at the time of defendant's trial but excluded the photograph of defendant's horse and children as cumulative.

Defendant contends the court erred in excluding the photograph of his horse. The trial court determines relevancy of mitigating evidence and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury. (*People v. Cain, supra,* 10 Cal.4th at p. 64; *People v. Fauber* (1992) 2 Cal.4th 792, 856 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Here, the trial court admitted a photograph depicting defendant's home in Guatemala and his three children. The jury heard testimony from defendant's wife that he and she raised all three children together and that defendant would ride his horse to deliver medications to the local village people. Accordingly, we conclude the trial court did not err in finding the photograph of defendant with his horse irrelevant or in excluding it under Evidence Code section 352.

### 2. *Asserted Instructional Error Regarding Evidence of Unadjudicated Criminal Activity*

Defendant contends the trial court committed numerous errors in instructing the jury regarding evidence of unadjudicated criminal activity introduced under section 190.3, factor (b).

---

[20] Because we have concluded that defendant was not prejudiced by any error in excluding Rego Roberto's testimony, we need not address his second contention that the testimony was admissible under the spontaneous declaration exception to the hearsay rule. (Evid. Code, § 1240.) In addition, defendant forfeited this issue by failing to assert this ground at trial.

### a. *Instructions on Unadjudicated Criminal Activity*

The notice of aggravating evidence the prosecution filed before trial included the attempted rape of de Maderos in Guatemala. In a hearing outside the presence of the jury, the trial court indicated to counsel that it did not intend to instruct the jury on any elements of this offense because the issue for the jury to decide was "whether they're convinced beyond a reasonable doubt that the defendant either did or attempted to use force or violence in an illegal manner upon another person." Defense counsel, however, asked that the jury receive the instruction on attempted rape. The trial court informed counsel that if it gave an instruction on attempted rape, it also would instruct the jury on assault with a deadly weapon and attempted murder. It reasoned that if the jury did not find beyond a reasonable doubt the alleged conduct was an attempted rape, it could nonetheless consider the conduct under section 190.3, factor (b), as either an assault with a deadly weapon or an attempted murder. Over counsel's objection that only the attempted rape instruction should be given, the trial court instructed the jury on attempted rape, assault with a deadly weapon, and attempted murder. The court then denied counsel's request for instructions defining battery and brandishing a weapon.

On appeal, defendant contends the trial court erred in instructing the jury on assault with a deadly weapon and attempted murder. He argues that he was entitled to rely on the particular offense alleged by the prosecutor in his notice of evidence in aggravation (e.g., attempted rape) in presenting his defense without having to defend against additional related offenses during trial. Not so.

 Evidence of prior violent conduct is admitted under section 190.3, factor (b), " 'to enable the jury to make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed.' " (*People v. Davis* (1995) 10 Cal.4th 463, 544 [41 Cal.Rptr.2d 826, 896 P.2d 119].) The probative value of this evidence lies in the defendant's conduct that gave rise to the offense. (*Ibid.*) The prosecution's notice that evidence will be presented regarding a specific violent crime or crimes should alert counsel that evidence of all crimes committed during the same course of conduct may be offered, and, therefore, substantially complies with the notice requirement of section 190.3. (*People v. Visciotti* (1992) 2 Cal.4th 1, 70 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

Here, defendant does not complain that he was unaware of the multiple offenses potentially arising out of the attack on de Maderos, nor could he. Defendant's investigator interviewed de Maderos more than a year before trial. She related that defendant pointed his machete at her throat and threatened to rape and kill her. Therefore, because the crimes of assault with a

deadly weapon and attempted murder were also committed as part of the same course of conduct as the attempted rape, the prosecution substantially complied with the notice requirement under section 190.3. (*People v. Visciotti, supra,* 2 Cal.4th at p. 70.)

Defendant, moreover, has not shown any prejudice. Generally, in the absence of any showing that a delay in the notice affected counsel's trial strategy, the appropriate remedy for a violation of the notice requirement would be to grant a continuance as needed to permit the defendant to prepare a response. (*People v. Pinholster* (1992) 1 Cal.4th 865, 956–958 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Defendant did not request a continuance nor did he otherwise indicate he was unable to prepare a defense. (*Id.* at p. 958.) Accordingly, defendant's claim fails.

### b. *Refusal of Instructions on Lesser Included Offenses*

Defendant contends the trial court improperly refused his request for instructions on battery (§ 242) and brandishing a weapon (§ 417).

Instructions on the elements of the offenses presented under section 190.3, factor (b) are not required in the absence of a request by counsel. (*People v. Anderson* (2001) 25 Cal.4th 543, 589 [106 Cal.Rptr.2d 575, 22 P.3d 347]; see also *id.* at p. 589, fn. 14 [rule that instruction on elements of prior violent crime is not required sua sponte is unaffected by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]].) A trial court, however, may give such "elements" instructions on its own motion when they are " 'vital to a proper consideration of the evidence.' " (*People v. Cain, supra,* 10 Cal.4th at p. 72.)

Once defense counsel asked that the jury be instructed on attempted rape, the trial court informed counsel it would also instruct on assault with a deadly weapon and attempted murder. Based on de Maderos's testimony that defendant poked her throat with his machete and threatened to kill her, there was substantial evidence to support instructing the jury on assault with a deadly weapon and attempted murder. In addition, the court expressed concern that if only the attempted rape instruction were given, the jury might become confused and question whether the evidence could be considered under section 190.3, factor (b) if it believed defendant physically attacked de Maderos as she testified but still retained a reasonable doubt as to whether defendant intended to rape her. The court further reasoned that "if the jury believes that the activities alleged were beyond a reasonable doubt committed by the defendant, and he threatened to kill her and attempted to kill her, that is evidence of prior act[s] involving force or violence, and it doesn't matter whether it's for the purpose of rape."

On the other hand, the trial court specifically found instructions on simple assault or brandishing a weapon were not warranted based on the evidence: "if you believe [de Maderos], it was either an [assault with a deadly weapon], it certainly wasn't a simple assault, or a brandishing of a weapon. That would involve conjecture. If it didn't happen the way she said it did, which amounts to at the very least an [assault with a deadly weapon], then it was nothing."

We agree with the trial court's assessment of the facts and its conclusion that the instructions were not warranted under those facts. Accordingly, we need not decide whether a trial court is ever obligated to instruct on lesser offenses requested by trial counsel at a penalty phase.

Moreover, any error in failing to give the requested instructions was harmless. As the People correctly point out, the issue before the jury was whether defendant used force or violence or the express or implied threat to use force or violence. (§ 190.3, factor (b).) Even if the requested lesser included offense instructions were given and found true by the jury beyond a reasonable doubt, the result would necessarily be the same: defendant used or threatened to use force or violence. As the trial court expressed, "If [the jury] believe[s] [de Maderos] beyond a reasonable doubt, that somebody did these things, I don't think there's any question but what [*sic*] it involves the threat of or attempt to use force or violence on another person." Under these circumstances, there is no reasonable possibility that any error in failing to instruct the jury on simple assault or brandishing a weapon affected the verdict. (*People v. Avena* (1996) 13 Cal.4th 394, 433 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

### c. *Assertedly Improper Characterization of Attack on de Maderos*

Defendant contends, in essence, that when the trial court instructed the jury regarding the evidence that defendant had attacked de Maderos 10 to 12 years earlier, it repeatedly and improperly directed a verdict that defendant's conduct constituted "an attempted rape, assault with a deadly weapon, and/or attempted murder." He asserts the erroneous instructions increased the aggravating effect of this evidence.

We conclude the trial court properly instructed the jurors that it was for them to determine whether the evidence of the attack on de Maderos amounted to an attempted rape, assault with a deadly weapon, or attempted murder. In assessing whether the jury instructions given were erroneous, the reviewing court " ' "must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' " (*People v.*

*Martin* (2000) 78 Cal.App.4th 1107, 1111 [93 Cal.Rptr.2d 433]; see Cal. Const., art. VI, § 13; see also *People v. Williams, supra,* 16 Cal.4th at p. 675 [claims of instructional error are evaluated " ' "in the context of the overall charge" ' " to the jury].)

Here, in addition to the challenged instructions, the court instructed the jurors under CALJIC Nos. 2.90 and 8.87 that when determining whether defendant committed an attack on de Maderos that constituted an attempted rape, assault with a deadly weapon, or attempted murder, they were to presume defendant was innocent until the evidence proved otherwise beyond a reasonable doubt. The jurors were specifically instructed that they must be convinced beyond a reasonable doubt that defendant committed such criminal activity before they could consider the evidence as an aggravating factor. In addition, the court told the jurors that if there was any reasonable doubt that the prosecution proved defendant committed the criminal activity, then the jurors must not consider the evidence for any purpose.

Various other instructions informed the jurors that defendant was to receive the benefit of reasonable doubt: CALJIC No. 2.01 (sufficiency of circumstantial evidence) CALJIC No. 2.72 (proof of corpus delicti) and CALJIC No. 2.91 (burden of proving identity). Therefore, in considering the overall charge to the jury, we conclude there was no reasonable likelihood that the jurors misconstrued or misapplied the instructions under the belief that the trial court was directing them to find the conduct alleged constituted an attempted rape, assault with a deadly weapon, or attempted murder. (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

### d. *Failure to Give Instructions on Intoxication*

Defense counsel requested the trial court instruct the jury on intoxication as part of its instructions on other crimes evidence. The trial court stated it would instruct on voluntary intoxication pursuant to CALJIC Nos. 4.21.1 and 4.22, as it had in the guilt phase, but it failed to do so. Defendant contends the court erred.

Although defendant failed to object to the trial court's failure to give the intoxication instructions, we find this issue cognizable because it involves a claim of instructional error affecting his substantial rights. (*People v. Hill, supra,* 17 Cal.4th at p. 843, fn. 8; *People v. Prieto, supra,* 30 Cal.4th at p. 268; § 1259.) As for the merits, there was insufficient evidence that defendant was intoxicated to warrant the requested instructions. As the People point out, de Maderos testified that defendant did not smell of alcohol. Ramirez testified he did not smell defendant's breath but only thought defendant was drunk because he was walking bent over.

### 3. *Miscellaneous Challenges to Jury Instructions*

Defendant asserts various other challenges to the jury instructions that we have previously rejected. Defendant raises no basis for reconsideration of those rulings. The trial court may properly refuse as argumentative an instruction that one mitigating factor may be sufficient for the jury to return a verdict of life imprisonment without possibility of parole. (*People v. Prieto, supra*, 30 Cal.4th at pp. 263–264; *People v. Hines* (1997) 15 Cal.4th 997, 1068–1069 [64 Cal.Rptr.2d 594, 938 P.2d 388].) "[T]here is no *requirement*, under either state or federal law, that the court specifically instruct the jury to consider any residual doubt of defendant's guilt." (*People v. Sanchez* (1995) 12 Cal.4th 1, 77 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; accord, *People v. Lawley, supra*, 27 Cal.4th at p. 166.) The trial court is not required to instruct the jury that it could consider sympathy and mercy. (*People v. Clark, supra*, 3 Cal.4th at p. 163.) The trial court has no duty to identify which factors might be aggravating and which factors might be mitigating. (*People v. Jones* (2003) 30 Cal.4th 1084, 1123 [135 Cal.Rptr.2d 370, 70 P.3d 359].) The trial court can properly refuse as argumentative an instruction that identifies particular evidence as mitigating. (*People v. Musselwhite, supra*, 17 Cal.4th at pp. 1269–1270; *People v. Benson* (1990) 52 Cal.3d 754, 804–806 [276 Cal.Rptr. 827, 802 P.2d 330].) Defendant claims that we should reconsider some of these rulings in light of *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey, supra*, 530 U.S. 466. Those cases, however, do not affect California's death penalty law. (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

### 4. *Alleged Prosecutorial Misconduct*

#### a. *References to Matters Not in Evidence*

During closing argument in the penalty phase, the prosecutor asserted that when defendant asked Susan Michel whether she had come from Powell's house shortly before the murder, defendant may have "become somewhat excited at the prospect of the terror that he was going to inflict later on." He then invited the jurors to put themselves in defendant's shoes and visualize, based on the evidence, what he saw as he killed Powell: "Now the first thing that he did when he commenced the attack, after he grabbed that knife out of the butcher block, was he took the knife and he caused these little poke wounds that you saw in the—

"[Counsel]: I am going to object to that. That's not Dr. Golden's testimony. I think that's a misstatement.

"The Court: Overruled.

"[The prosecutor]: He took these and caused these poke wounds in her breasts, and I want you to think about, based upon the evidence, what he would have seen reflected in [Powell's] face when he did this to her. We don't have any direct evidence of that but we have real good circumstantial evidence. Because I want you to recall how squeamish and how much pain we feel when we go to the doctor's office and they take a little needle and prick our fingers in order to draw some blood, and then imagine the horror and the terror that he saw reflected in the face of [Powell] as he took a butcher knife and poked her and poked her and poked her in the breasts with that butcher knife.

"But in seeing the effects that this was having on . . . Powell, instead of stopping what he was doing, he continued. It only served to further excite and entice him. And he decided to go ahead in slitting her breasts open, which you also saw in the autopsy photographs, the right and left breast, essentially taking that knife and kind—I don't know what the right term would be, fondling or outlining the contours of the breast while making these incise wounds."

The prosecutor then argued that although defendant had time to consider his actions, he did not stop because he enjoyed what he was doing: "And then . . . [Powell] undoubtedly realizing that there was no way she was going to get through that door, turned to face him and he looked right into the face of this woman who, in the words of [counsel], had shown him nothing but kindness. He had the opportunity to consider how kind and gentle this woman was, and instead of stopping what he was doing, instead of saying, 'my God, I—I can't do this to another human being, I must stop,' he continued with a fusillade of blows as she lifted up her arms and feebly tried to hide behind them because she wasn't even apparently capable of hitting back. Blows which were so ferocious, that he almost cut right down to the bones of her arms.

"And then finally, he saw [Powell] lying on the floor and what must have been the most unimaginable pain, but nevertheless someone who, according to the doctor's testimony, the coroner, could have survived up to that point, maybe she would have been permanently disfigured but she could have survived. And as a medic, the defendant would have known that. And he could have thought to himself, 'what have I done, I must stop, I must stop the bleeding, I must save this woman, I must call for help.' But instead, the only thing that he was capable of thinking of was where to position himself in the room in order to get the very best angle to be able to take this knife and plunge it in her throat over and over again until he was absolutely certain, 100 percent convinced that . . . Powell would never again walk the face of this earth.

"Now, . . . the kind of person who can do what the defendant did to her with that knife is a very special kind of individual.

"And even if we don't have the exact sequence correct of everything that happened, you know that everything that I just said happened. And that the defendant had time during each one of those events and in between each one of them to have seen in the most graphic ways that we could ever imagine what he was doing to another human being and to have stopped.

"Now, what do you call that when someone does to another person what he did to Kathy Powell when he takes that knife and, in essence, fondles her and coaxes her and taunts her with it. None of those words, are really accurate to describe what it is because I don't know if we have words in the English language that were calculated to describe what [defendant] is capable of. But the word that comes closest, of course, is torture. That's what he was doing to this woman when he was playing with her with that knife.

"Torture.

"Why did he do it? He did it because he enjoyed it. He did it because when he saw the pain and the torment and the terror, it only served as a catalyst for him to increase his level of violence. He did it . . . because this is a person who gains emotional fulfillment, psychological satisfaction from pain. Didn't have any financial motive, didn't have any other motive.

"And certainly this has to be probably the most powerful circumstance in aggravation because what kind of a murder is worse than the kind of an individual who kills not because they need money or for some other reason, but because they like to. This is a person who had absolutely no motive to do what he did except his own ideology and belief that the sanctity of human life is somehow subservient to his own twisted desire for pleasure."

The prosecutor further suggested the jurors should not consider the defense evidence that defendant was a medic in Guatemala mitigating because it showed that defendant took pleasure in penetrating a person's skin with a needle: "And is it maybe that we are all just a little bit uncomfortable or squeamish or was it the idea that . . . this is a man who for some bizarre reason gets sexual satisfaction out of penetrating the skin even in little ways. And that maybe you just felt a little squeamish and uncomfortable when you somehow learned that he also goes out of his way to run through the forests of Guatemala to give people injections. I don't know what you were thinking. But it might be something for you to explore in the jury room."

Outside the presence of the jury, trial counsel objected that there was no evidence to support the prosecutor's arguments and that in any event, the

defendant's asserted emotional fulfillment and psychological satisfaction from pain were not proper aggravating circumstances under section 190.3. The trial court denied counsel's objection, finding the prosecutor's arguments properly related to the circumstances of the crime, factor (a) of section 190.3. Without identifying any particular argument, the court then added that it thought some of the prosecutor's arguments were "fallacious" and "built on a foundation of sand."

Defendant now contends the prosecutor improperly argued facts not in evidence during argument when he asserted that defendant killed for pleasure, became excited about the prospects of terror, and "gain[ed] emotional fulfillment, psychological satisfaction from pain." He adds the prosecutor committed further misconduct by arguing defendant's affinity for killing "has to be probably the most powerful circumstance in aggravation."

On appeal, we apply the same standard to evaluate a claim of prosecutorial misconduct at the penalty phase that we apply at the guilt phase. (*People v. Valdez, supra,* 32 Cal.4th at p. 132.) But when misconduct has been established, in determining prejudice, we must decide " 'whether there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner.' " (*Id.* at pp. 132–133.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye, supra,* 18 Cal.4th at p. 970.)

■ Each party is entitled to comment fairly on the evidence and the reasonable inferences that can be drawn from the evidence. (*People v. Hill, supra,* 17 Cal.4th at p. 819.) Here, we conclude the prosecutor's comments either were properly based on the evidence or were nonprejudicial. Contrary to defendant's assertions, the prosecutor did not actually refer to defendant as a "sexual sadist." (But see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] [use of opprobrious epithets is proper when reasonably warranted by the evidence].) The prosecutor commented on defendant's conduct at the time of the murder and did not assert defendant suffered from a mental disorder. In addition, that the trial court may have found some of his arguments were "fallacious" and "built on a foundation of sand" is of no consequence in light of its finding that they were relevant under factor (a) of section 190.3, the circumstances of the crime. It is for the jury to determine whether the inferences the prosecutor draws in closing argument are reasonable. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

■ We further disagree that the prosecutor essentially argued defendant suffered from a mental disorder of sexual sadism and improperly urged the

jury to consider defendant's disorder as an aggravating factor under section 190.3. Factor (a) of section 190.3 allows the prosecutor and defense counsel to present to the penalty phase jury evidence of all relevant aggravating and mitigating matters "including, but not limited to, *the nature and circumstances of the present offense*, . . . and the defendant's character, background, history, *mental condition* and physical condition." (Italics added.) Evidence that reflects directly on the defendant's state of mind contemporaneous with the capital murder is relevant under section 190.3, factor (a), as bearing on the circumstances of the crime. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1163–1164 [64 Cal.Rptr.2d 892, 938 P.2d 950]; see also *People v. Smith* (2005) 35 Cal.4th 334, 354–355 [25 Cal.Rptr.3d 554, 107 P.3d 229] [the prosecution can present evidence of the defendant's mental illness or bad character under factor (a) even if it also bears upon a mitigating factor]; *People v. Avena, supra*, 13 Cal.4th at p. 439 ["The fact that evidence of defendant's [capital crime] was also indicative of his character or mental condition does not render the evidence inadmissible"].)

In this case, the prosecutor's argument related to defendant's conduct at the time he murdered Powell and could not reasonably have been construed by the jury as a medical diagnosis that defendant suffered from "sexual sadism." Further, because the trial court found the prosecutor's arguments that defendant experienced "emotional fulfillment, psychological satisfaction from pain" and enjoyed causing Powell to suffer to be relevant to the circumstances of Powell's murder, such matters could properly be considered by the jury as evidence in aggravation under section 190.3, factor (a). Whether or not these circumstances were the most powerful aggravating circumstances was a matter for the jury to determine.

Defendant next claims the prosecutor improperly turned the mitigating evidence about his work giving people medical injections in Guatemala into something "sinister" by arguing defendant experienced "sexual satisfaction . . . penetrating the skin even in little ways." But even if the prosecutor's argument constituted misconduct, any misconduct was harmless under the applicable penalty phase standard because the jury likely recognized it as an advocate's hyperbole and discounted it accordingly. (*People v. Poggi* (1988) 45 Cal.3d 306, 340 [246 Cal.Rptr. 886, 753 P.2d 1082].)

b. *Mischaracterization of Evidence*

Defendant contends the prosecutor improperly characterized the sequence of Powell's murder and argued without evidence that Powell was psychologically vulnerable, that defendant breached her trust, and that defendant lurked in the darkness waiting for her. He first challenges the prosecutor's presentation of his theory on the sequence of events leading up to Powell's murder.

(See *ante*, at pp. 1150–1151.) The trial court overruled defendant's objection that the prosecutor misstated the coroner's testimony. On appeal, defendant's contends there was no evidence to support this theory.

A prosecutor may properly discuss the circumstances of defendant's crime when arguing in favor of the death penalty. (*People v. Navarette* (2003) 30 Cal.4th 458, 519 [133 Cal.Rptr.2d 89, 66 P.3d 1182].) A prosecutor also may express an opinion on the state of the evidence and relate the People's theory of the case in a comprehensible, story-like manner. (*People v. Frye, supra,* 18 Cal.4th at pp. 975–976.)

Here, the coroner testified that Powell suffered poke wounds, stabbing to the back and neck, and defensive wounds on her arms and hands. Several of these wounds could have been fatal.

During his argument, the prosecutor informed the jury that the inferences he drew from the evidence reflected his theory and not necessarily what actually happened. He explained that there was no direct evidence of what transpired at the time defendant murdered Powell, and thus, the jury would have to rely on the circumstantial evidence to determine what Powell experienced. Further, after presenting his sequence of events, the prosecutor told the jury, "[E]ven if we don't have the exact sequence correct of everything that happened, you know that everything that I just said happened." The prosecutor properly based his theory on the evidence admitted at trial or reasonable inferences drawn from it. Therefore, we conclude the prosecutor's argument was not improper.

Defendant further contends the evidence does not support the prosecutor's argument that Powell was psychologically vulnerable and that defendant breached her trust and lurked in the dark, waiting to kill her. During argument, the prosecutor portrayed Powell as psychologically vulnerable and someone who clung to "a childlike belief that all people are good at heart." He stated that anyone who met her would have been aware of her vulnerability. The prosecutor then questioned whether defendant gave Powell either some indication that although he seemed outwardly quiet and harmless, he was "a monster inside" or a warning such as, "Kathy, you can't trust me, I know I might seem quiet and harmless, but watch out because there's a monster inside." Continuing, the prosecutor described Powell as someone who would never have been able to look into defendant's "cold, cold eyes" and see the "emptiness behind them." He suggested that Powell was "too decent to . . . protect herself" and that defendant saw this weakness in her and perceived her as a "convenient target." The prosecutor further accused defendant of "abus[ing] the trust that Kathy Powell placed in him" and "lurking in the darkness of Powell's home, waiting for her."

The trial court overruled defendant's objections that there was no evidence to support this line of argument and that Powell's vulnerability and defendant's breach of her trust were not aggravating factors under section 190.3. It ruled the argument was properly based on evidence of the circumstances of Powell's murder.

We agree that the prosecutor's argument was properly based on the evidence or reasonable inferences drawn from it. A prosecutor may identify those traits of the victim that made the victim vulnerable to crime when such characteristics are relevant to the charged crimes, and has no duty " 'to shield the jury from all favorable inferences about the victim's life or to describe relevant events in artificially drab or clinical terms.' " (*People v. Frye, supra,* 18 Cal.4th at p. 975.)

Further, the trial court instructed the jury that it was to "determine what the facts are from the evidence received during the entire trial." (CALJIC No. 8.84.1.) Whether to draw the same inferences as those urged by the prosecutor regarding the circumstances of Powell's murder was, thus, a question for the jury to decide. There was no misconduct.

### c. *Argument Regarding Aggravating Factors*

The prosecutor argued Powell's vulnerability, defendant's breach of trust, and defendant's pleasure from stabbing were separate aggravating factors under section 190.3, factor (a). He also used the same aggravating circumstances language when he discussed other crimes evidence admissible under section 190.3, factor (b). As a result, defendant contends the prosecutor's use of the term "aggravating circumstance" confused jurors about the weighing process and encouraged them "to apply factor (a), the circumstances of the crime, three different times in three different ways." Ultimately, the prosecutor's argument had the effect of "skewing the weight accorded this factor and created the risk of an arbitrary or unreliable death verdict."

The People initially assert that defendant failed to object to the prosecutor's argument on this basis at trial. Defendant counters that such a basis was inherent in his objection that the above circumstances of the crime described by the prosecutor were not aggravating circumstances under section 190.3. We think this objection was sufficient to preserve the issue. But the claim fails on the merits. Defendant fails to cite anything in the record that suggests the jury was confused by the prosecutor's argument or the instructions it was given. The prosecutor merely suggested to jurors how they could consider each piece of evidence under the specified statutory factors.

In addition, the court instructed the jury under CALJIC No. 8.88 that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere

mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them"; and that in determining which penalty was justified, it should "consider the totality of the aggravating circumstances with the totality of the mitigating circumstances."

In sum, because the prosecutor did not urge the jury to double-count or triple-count the circumstances of the crime in weighing the aggravating and mitigating circumstance, the possibility of prejudice is "remote." (*People v. Ochoa, supra,* 26 Cal.4th at p. 457.) In light of the prosecutor's remarks and the standard instructions about the weighing of aggravating and mitigating circumstances given in this case, we find no reasonable likelihood the jurors were misled or confused in the manner defendant suggests or otherwise applied the instructions in an illegally improper manner. (*People v. Ayala* (2000) 24 Cal.4th 243, 289–290 [99 Cal.Rptr.2d 532, 6 P.3d 193].)

### 5. *Retention of Juror*

Defendant contends the trial court improperly retained Juror R. during deliberations despite time conflicts that placed pressure on the jury to reach a verdict.

#### a. *Factual Background*

On Wednesday, September 1, 1993, approximately 30 minutes after jury deliberations commenced, the jury returned to the courtroom. Juror R. informed the trial court that he intended to start a two-week vacation on Friday. The trial court informed the juror that travel commitments were not a legal cause to excuse him from jury duty. The trial court then told Juror R. that he could be excused if he were to experience a financial hardship. Juror R. stated he would not permit his vacation plans to affect his deliberations. The trial court admonished the jury to resume its deliberations. The court declined counsel's request to remove Juror R. The jury deliberated until 4:00 p.m.

On Thursday, prior to the readback of certain testimony at the jury's request, the trial court made further inquiry into Juror R.'s travel plans. Juror R. stated he made arrangements to begin his vacation on Saturday. If the jury did not reach a verdict before Saturday, he intended to claim a financial hardship based on the prepaid costs of his vacation. Juror R. assured the court that his vacation plans would not affect his deliberations. No juror indicated that his or her deliberations would be affected by Juror R.'s vacation plans. The jury deliberated until 4:15 p.m.

On Friday, at 3:00 p.m., the court and counsel conferred to discuss Juror R.'s status. Defense counsel asked the court to excuse Juror R.,

substitute an alternate juror in his place, and commence deliberations anew immediately, rather than on Tuesday. The prosecutor noted the time and argued that nothing would be gained by permitting the jury to commence deliberations anew for one hour rather than allowing Juror R. to continue deliberating with the jury until the end of the day and substitute an alternate juror at that time, if needed. Trial counsel complained that there was "a subconscious coercion" by permitting Juror R. to remain on the jury.

The trial court stated that it saw no risk of coercion and that it preferred the original 12 jurors render the penalty verdict. It was "reluctant to disturb the composition of the original jury except in those instances where I find a risk to a fair and impartial outcome or a hardship on a juror." The court brought the jurors into the courtroom and informed them that Juror R.'s status remained the same. The court stated that if the jury could not reach a verdict by the end of the day, it would excuse Juror R. and an alternate juror would be substituted in his place. The court admonished the jury that Juror R.'s situation should not affect their deliberations. No juror indicated that it would. Approximately one hour later, the jury returned its death verdict.

### b. *Analysis*

■ Section 1089 provides in relevant part that "If at any time, whether before or after the final submission of the case to the jury, . . . a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box . . . ." A trial court's ruling whether to discharge a juror for good cause under section 1089 is reviewed for abuse of discretion. (*People v. Hart* (1999) 20 Cal.4th 546, 596 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].) The juror's inability to perform the functions of a juror must appear in the record as a "demonstrable reality" and will not be presumed. (*People v. Lucas, supra,* 12 Cal.4th at p. 489.) The trial court's finding whether "good cause" exists will be upheld on appeal if substantial evidence supports it. (*Beeler, supra,* 9 Cal.4th at p. 975.)

Here, based on our review of the record, we conclude the trial court properly retained Juror R. during the penalty phase deliberations. Juror R. unequivocally stated he would vote for the penalty he thought was appropriate without regard to his vacation plans. Our review of the record finds nothing to suggest he was unable to function as a juror. The trial court, moreover, was in the best position to observe Juror R.'s demeanor. (*People v. Beeler, supra,* 9 Cal.4th at p. 989.) The record also does not indicate that any other juror was affected by Juror R.'s vacation plans or that the jury was coerced into rendering its verdict. The trial court asked the jurors twice

whether Juror R.'s vacation plans would affect their deliberations and on both occasions received no affirmative response from any juror. It also made clear to the jury, including Juror R., that if it did not reach a verdict, it would remove Juror R. to permit him to go on his vacation. Thus, the jury knew that Juror R. would have his vacation whether or not it reached a verdict. Defendant's assertion that the jury would hasten its deliberations to accommodate Juror R.'s vacation plans finds no support in the record.

Finally, we reject defendant's contention that the trial court insufficiently questioned the jury to ascertain the effect of Juror R.'s vacation plans, if any, on its deliberations. The trial court retains discretion about what procedures to employ, including conducting a hearing or detailed inquiry, when determining whether to discharge a juror. (*People v. Beeler, supra,* 9 Cal.4th at p. 989.) We discern no abuse of discretion in the manner the trial court conducted its inquiry of the jury.

### 6. *Denial of Motion for New Trial*

After the close of the penalty phase, but before sentencing, defendant filed a motion for a new trial, arguing among other things, the evidence was insufficient to support special circumstance of attempted rape. The trial court denied the motion.

Defendant argues the trial court erred in denying his motion for new trial because it failed to conduct an independent review of the evidence, as required, and instead, erroneously applied the deferential substantial evidence standard and reviewed the evidence in the light most favorable to the judgment. We disagree.

When a verdict has been rendered or a finding made against the defendant, he may move for a new trial on various statutory grounds including that the verdict is contrary to the law or evidence. (§ 1181.) A trial court may grant a motion for new trial only if the defendant demonstrates reversible error. (*People v. Clair, supra,* 2 Cal.4th at p. 667.) With regard to claims of sufficiency of the evidence, we have stated: "In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.]" (*People v. Davis, supra,* 10 Cal.4th at pp. 523–524.) On appeal, a trial court's ruling on a motion for new trial is reviewed for abuse of discretion. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 128.) Its

ruling will not be disturbed on appeal " 'unless a manifest and unmistakable abuse of discretion clearly appears.' [Citation.]" *(People v. Davis, supra,* 10 Cal.4th at p. 524.)

We conclude the trial court did not abuse its discretion in denying defendant's motion. The record establishes that in considering the motion for a new trial, the trial court independently weighed the evidence and determined witness credibility, but did not substitute its judgment for that of the jury. The court discussed the sufficiency of the evidence that defendant attempted to rape Powell: "If there is one thing that I can say with dead certainty, it is that the evidence in this case clearly shows beyond a reasonable doubt that the defendant was the perpetrator of the crime"; "I stand by my analysis that I made at the time of the 1118.1 motion. As I look at all of this evidence, I do not see how I can come to the conclusion that the trier of fact proceeded to come to the conclusion that the defendant committed this act while attempting to rape the victim as being a flight of fancy, or the product of prejudice of any kind"; "But in view of the statement about 'panocha,' in view of the very graphic illustration of sexual intercourse [defendant's gyrations while repeating 'Kathy-me, me-Kathy'], I again state that the only reasonable conclusion is that the defendant wanted to have sexual intercourse with the victim"; "I've turned all of these circumstances over and over in my mind and speculated about lots of things far out and I just cannot see any reasonable interpretation of all of the evidence here and the reasonable inferences to be drawn but that the defendant desired sexual intercourse with this woman as easily as he could get it but if he couldn't get it easily he would get it by force"; "A jury found Odell Braziel to be credible. I find Odell Braziel to be credible. Certainly not as to every detail. But as I say, the broad brush strokes as to the defendant's sexual interest in this victim and the defendant's prior indications of his strong attraction to her and what he was seeking. Yes, I find Odell Braziel to be eminently credible."

### 7. *Denial of Automatic Application for Modification of the Judgment*

#### a. *Preservation of Issue and Standard of Review*

Defendant contends the trial court erred in denying his automatic application for modification of the judgment because it (1) speculated he had planned the crime, and (2) refused to consider sympathetic factors in mitigation. He has forfeited the first issue because he failed to make a contemporaneous objection on this ground at trial. The contemporaneous objection rule applied at defendant's modification hearing, held on November 22, 1993. *(People v. Riel, supra,* 22 Cal.4th at p. 1220 [the rule requiring an objection applies to cases in which the modification hearing was held after this court's

decision in *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984], became final].) Defendant contends that an objection would have been futile because he had argued in his new trial motion, heard immediately before the modification hearing, that there was no evidence he had planned Powell's murder. We disagree because defendant did not clearly argue absence of planning even in the new trial motion. Moreover, denial of a new trial motion does not mean this objection at the modification hearing would have been futile. We do, however, believe that defendant's argument the modification hearing regarding use of sympathetic factors was sufficient to preserve that claim.

 The entire contention lacks merit. In ruling on an automatic application for modification of the verdict under section 190.4, subdivision (e), the trial judge "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." The trial court's ruling must be based only on the evidence presented at trial. (*People v. Sakarias* (2000) 22 Cal.4th 596, 648 [94 Cal.Rptr.2d 17, 995 P.2d 152].) "[T]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.* [Citations.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) The trial judge must provide "a ruling adequate ' "to assure thoughtful and effective appellate review." ' " (*People v. Arias, supra,* 13 Cal.4th at p. 191.)

"On appeal, we subject a ruling on a verdict-modification application to independent review." (*People v. Clair, supra,* 2 Cal.4th at p. 689.) "Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty." (*People v. Mickey, supra,* 54 Cal.3d at p. 704.)

b. *Evidence of Planning*

Defendant first contends the trial court improperly speculated that he planned Powell's murder. His contention is without merit. The trial court's remark ("As to the crime for which defendant was convicted, it is clear from the evidence that it was a planned offense, not spur-of-the-moment") reflects a reasonable interpretation of the evidence presented to the jury. Even though the court expressed uncertainty whether the evidence showed the murder was premeditated, evidence that defendant planned his attack on Powell was

compelling. Defendant remained at the jobsite until after all of the other construction workers had left for the day. When one of Powell's neighbors walked by in the afternoon, he asked her if she had come from Powell's house, assuring himself that Powell would be alone in the house.

### c. *Sympathetic Factors*

At the modification hearing, counsel summarized the testimony of the penalty phase witnesses who testified to defendant's good deeds in Guatemala and urged the trial court to strike the death penalty based on this evidence alone. He also argued that defendant was a good member of his community when he was not intoxicated. The trial court found that the aggravating circumstances substantially outweighed the mitigating circumstances and rejected the automatic application for a reduction in sentence from death to life without the possibility of parole.

Defendant contends that in deciding his verdict-modification application the trial court erred because it refused to consider sympathetic factors in mitigation. He specifically complains the court ignored the sympathetic value of the evidence of his good deeds and community involvement described *ante*. Defendant cites as error the following statements by the trial court: "So the logic of the setup of the statutory scheme plus the decisions of the Supreme Court lead me to the inescapable conclusion that a trial court does not assess whether [the death penalty] was appropriate, that considerations of mercy and sympathy come into play in only two areas when a death penalty is involved. [¶] They are factors appropriate for the jury to consider, . . . and number two, of course, historically they continued to employ factors considered by the governor when it comes to his commutation powers. But they are not within the purview of the trial judge."

As defendant correctly argues, we have recognized that sympathetic factors are integral to both the jury's penalty determination and the trial court's ruling on a motion for modification of the verdict. (See *People v. Dyer* (1988) 45 Cal.3d 26, 84 [246 Cal.Rptr. 209, 753 P.2d 1] [the court's comments reflected its understanding that it could properly consider sympathy in making its decision]; *People v. Williams* (1988) 44 Cal.3d 883, 971–972 [245 Cal.Rptr. 336, 751 P.2d 395] ["the jury, and the judge in deciding whether to modify a verdict of death, must be permitted to consider any evidence that is relevant and potentially mitigating," including evidence that "may reflect remorse, or otherwise arouse sympathy in either jury or judge"].) But "[s]ympathy is not itself a mitigating 'factor' or 'circumstance,' but an emotion." (*People v. Lanphear* (1984) 36 Cal.3d 163, 166 [203 Cal.Rptr. 122, 680 P.2d 1081].) The trial court is not required to find that evidence offered in mitigation does in fact mitigate. (*People v. Scott, supra*, 15 Cal.4th at p. 1222.)

Here, the record indicates the trial court painstakingly considered all of the evidence offered in aggravation and mitigation. It identified the evidence of defendant's good deeds in Guatemala, his intoxication on the day of the murder, and his lack of felony convictions as circumstances in mitigation it considered. The court specifically commented on the sympathetic value of the good deeds offered by defendant, although it found many of these deeds were not what it called "altruistic in nature." The court then independently weighed the evidence of aggravating and mitigating circumstances and found, as stated *ante*, the evidence of the aggravating circumstances substantially outweighed that of the mitigating circumstances. The court concluded the findings of the jury were appropriate based on the evidence presented. No more is required of the trial court. (*People v. Lang, supra,* 49 Cal.3d at p. 1045.)

The trial court made the remarks about sympathy and mercy in the course of commenting that, after assessing whether the evidence of the aggravating circumstances outweighs that of the mitigating circumstances, a trial court does not itself, independently and de novo, determine that the death penalty is appropriate in a particular case. (See § 190.4, subd. (e); *People v. Alvarez, supra,* 14 Cal.4th at p. 245.) Instead, as the trial court stated, its function in ruling on the verdict-modification application is to independently reweigh the aggravating and mitigating evidence and determine whether the evidence supports the jury's verdict. Its remarks concerning the mitigating evidence defendant offered reveal that it considered all such evidence although finding it worthy of little weight. The court's reference to mercy and sympathy not being "within the purview" of the trial judge are most reasonably understood as its declining to step outside the trial judge's proper role of independently reweighing evidence to substitute its own view of the appropriate penalty. It correctly stated that sympathetic factors may be considered by the jury in determining whether the death penalty is warranted (§ 190.3) and by the Governor in deciding whether to commute a sentence (Cal. Const., art. V, § 8).

### 8. *Proportionality Review*

■ Defendant contends his death sentence is disproportionate. We disagree. "To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the defendant's age, prior criminality and mental capabilities." (*People v. Cox* (2003) 30 Cal.4th 916, 969–970 [135 Cal.Rptr.2d 272, 70 P.3d 277].) "If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's culpability' [citation] or, stated another way, that the punishment

shocks the conscience and offends fundamental notions of human dignity [citation], the court must invalidate the sentence as unconstitutional." (*Id.* at p. 970.)

Here, on the day of the murder, defendant expressed his desire to have sexual intercourse with Powell and entered Powell's home throughout the day without permission. He planned to attack Powell after all of the construction workers had left. Defendant entered Powell's house, attempted to rape her, and inflicted numerous injuries on her with a large butcher knife before fatally stabbing her. Defendant had started to similarly attack another woman with a machete in his native Guatemala. After each attack, defendant made remarks that indicated he was proud of his actions. Finally, although he had been drinking on the day of the murder, there was no evidence he was emotionally or mentally impaired at the time of Powell's murder.

Accordingly, we find the penalty in this case not so disproportionate to defendant's personal culpability as to warrant reversal of his sentence. (*People v. Cox, supra*, 30 Cal.4th at p. 970.)

### 9. International Law

Defendant contends the constitutional violations he suffered in this case and California's death penalty system, in general, violate international law and the federal constitutional ban on cruel and unusual punishment under the Eighth and Fourteenth Amendments. We disagree. "Because defendant has failed to establish prejudicial violations of state or federal constitutional law, we need not consider whether such violations would also violate international law." (*People v. Bolden (2002) 29 Cal.4th 515, 567 [127 Cal.Rptr.2d 802, 58 P.3d 931].) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (People v. Hillhouse, supra, 27 Cal.4th at p. 511.) Further, "the death penalty is not cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution." (People v. Fairbank (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)*

### 10. Miscellaneous Constitutional Challenges

Defendant contends California's death penalty statute is unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have previously considered and rejected each of these challenges, and defendant offers no persuasive reason to reconsider our prior decisions. His reliance on *Ring v. Arizona, supra, 536 U.S. 584, and Apprendi v. New Jersey, supra, 530 U.S. 466, in support is unavailing as we have held Ring and Apprendi "do not affect California's death penalty law." (People v. Smith, supra, 30 Cal.4th at p. 642.) Therefore, we continue to hold the following:*

Section 190.3, factor (a), is neither vague nor overbroad, and does not impermissibly permit arbitrary and capricious imposition of the death penalty. (*People v. Maury, supra,* 30 Cal.4th at p. 439; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

Section 190.3, factor (b) is not unconstitutional for failing to "require that aggravating factors be proven beyond a reasonable doubt, require that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt, require that death must be found to be the appropriate penalty beyond a reasonable doubt [citation], or require that there be any burden of proof." (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

"Jury unanimity is not required on aggravating circumstances, which are not elements of an offense." (*People v. Maury, supra,* 30 Cal.4th at p. 440.)

California's death penalty statute is not unconstitutional in failing to require written findings and reasons for the jury's death verdict (*People v. Maury, supra,* 30 Cal.4th at p. 440) and failing to require intercase proportionality review (*People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007]).

The jury's consideration of unadjudicated criminal conduct as aggravating factors is not unconstitutional. (*People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

California's death penalty statute does not deprive capital defendants of equal protection because it fails to provide for disparate sentence review. (*People v. Brown, supra,* 33 Cal.4th at p. 402.)

### 11. *Cumulative Error*

Defendant contends that the cumulative effect of the guilt and penalty phase errors require reversal of his conviction and death sentence even if none of the errors is prejudicial individually. We have found no prejudicial error and no cumulative prejudice; thus, defendant's contention is without merit.

### III. Disposition

We affirm the judgment.

George, C. J., Kennard, J., and Baxter, J., concurred.

**WERDEGAR, J.,** Dissenting.—The evidence at defendant's trial amply proved he killed the victim, Kathleen Powell, in a brutal and unprovoked attack. His offense was at least second degree murder and may have been a greater crime. What the evidence failed to sufficiently demonstrate is that defendant killed Powell while engaged in the attempted commission of rape. For this reason, I dissent from affirmance of defendant's conviction for first degree murder with an attempted rape special circumstance. (Pen. Code, §§ 189, 190.2, subd. (a)(17)(C).)

In reviewing a criminal conviction or special circumstance finding challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) In the present case, the evidence bearing on defendant's actual intent when he attacked Powell was simply too ambiguous and uninformative—of too little "solid value" (*ibid.*)—to support the attempted rape finding.

I agree with the majority that sufficient evidence showed defendant was sexually interested in Powell. But his repeated chant of "Kathy for me, me for Kathy" suggests the expectation, however deluded, of a consensual encounter, at least as much as—arguably even more than—it suggests an intent to rape.

Defendant, who the evidence showed was intoxicated on the afternoon of the crime, apparently thought Powell returned his sexual interest. Defendant's coworker, Braziel, tried to talk him out of this mistaken belief, stating Powell liked him only as a friend, but defendant's continued chanting of "Kathy for me, me for Kathy" suggests he rejected Braziel's admonition. In this light, that defendant made an excuse to remain at the worksite and inquired of a neighbor whether she had come from Powell's house does not point distinctly to a planned forcible attack. I agree with the majority that a jury could reasonably infer defendant planned to catch Powell alone (maj. opn., *ante*, at p. 1131), but I disagree a jury could reasonably infer from this, beyond a reasonable doubt, that he intended to rape her. The jury had no way to know whether defendant went to Powell's home with the intent to rape her or merely anticipated consummation of what he thought was mutual attraction.

The majority seeks to buttress its conclusion that defendant's sexual interest in Powell and hope to find her alone supports a finding he intended to rape her (maj. opn., *ante*, at p. 1131) by pointing to the nature of Powell's wounds. Powell's body was fully clothed when discovered, and the physical

evidence showed neither semen nor genital trauma. The majority reasons, however, that the nature and location of Powell's wounds, in particular the pokes and slices to her breasts, gave rise to an inference that "defendant intended to force Powell to do something against her will," i.e., "to submit to his sexual intent." (*Ibid.*) But such wounds are as consistent with a sadistic desire to inflict pain—a desire prompted by rejection—as with an attempt to rape.

At trial, the prosecutor argued the wounds were "a substitute form of sex," i.e., sexual sadism. A sadistic intent may be evidence of an intent to torture; it is not, however, the same as an intent to rape. The physical evidence allowed a reasonable inference that defendant tortured and killed Powell out of anger because she refused him or out of jealousy over her friendship with his coworker, Braziel. That defendant poked and slashed Powell's breasts in an attempt to coerce her into sexual intercourse is also *possible*, but the evidence did not allow a reasonable juror to so find *beyond a reasonable doubt*. To say the cutting marks on Powell's breasts support a finding that defendant attempted to rape her is speculative at best.

The majority relies in part on *People v. Holloway* (2004) 33 Cal.4th 96, 138–139 [14 Cal.Rptr.3d 212, 91 P.3d 164], in which we distinguished earlier cases finding insufficient physical evidence of attempted rape. But *Holloway* involved much stronger evidence than this case. The defendant earlier had clearly tried to rape one victim (Debbie) and had then entered the townhouse where he killed the other victim (Diane). Diane, who her mother testified never slept nude, was found nude on her bed, her bedroom in disarray, her panties tucked under the mattress. She had ligature marks on her wrists and ankles. We held the evidence sufficient to find the defendant had entered the townhouse with the intent to rape Diane. (*Ibid.*) In the present case, the evidence shows neither disrobement, nor indications of bondage, nor the recent or contemporaneous attempt to rape another victim. Nor did defendant declare his intent to rape the victim, as in *People v. Carpenter* (1997) 15 Cal.4th 312, 387 [63 Cal.Rptr.2d 1, 935 P.2d 708], also cited by the majority (maj. opn., *ante*, at p. 1132). In determining the nature of Powell's wounds is substantial evidence that defendant killed her in the commission of rape or attempted rape, the majority extends *Holloway* beyond what the opinion will support.

As the majority observes, intent may be shown by circumstantial evidence. (Maj. opn., *ante*, at p. 1129.) But the circumstantial evidence must be substantial—it must be such that a reasonable jury could find it allows only one reasonable inference, that of criminal intent. In my view, the evidence of Powell's wounds is not of that type or quantity. A reasonable jury simply could not know beyond a reasonable doubt that defendant, when he attacked Powell, intended to force her to have sex with him before killing her.

Defendant's killing of Powell, whether or not performed with the intent to rape, was murder. It may have risen to first degree capital murder on the theory the wounds to Powell's breasts showed she was tortured before being killed (Pen. Code, §§ 189, 190.2, subd. (a)(18)), though this theory was not presented to the jury. But even viewing the record "in the light most favorable to the judgment below" (*People v. Johnson, supra,* 26 Cal.3d at p. 578), there was simply insufficient credible evidence of "solid value" (*ibid.*) from which a reasonable jury could conclude *beyond a reasonable doubt* that defendant, when he attacked Powell, intended to force sexual intercourse on her. The conviction of first degree murder and the special circumstance finding, both dependent on a finding of attempted rape, should be reversed.

Moreno, J., and Gilbert, J.,[*] concurred.

Appellant's petition for a rehearing was denied May 24, 2006. Werdegar, J., and Moreno, J., were of the opinion that the petition should be granted.

---

[*]Presiding Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.